[No. 5682-1-III.   Division Three.   July 26, 1984.]

MARY OMER, *Appellant,* v. GORDON EDGREN,
ET AL, *Respondents.*

*Nancy A. Wainwright* and *Miller & Wainwright, P.S.*, for appellant.

*Daniel E. McKelvey, Jr.*, and *Paine, Hamblen, Coffin & Brooke*, for respondents.

McINTURFF, J.—Mary Omer appeals an order of summary judgment dismissing her claim of malpractice.

On September 30, 1964, plaintiff Mary Omer, a wife, and mother of three children, had her first appointment with defendant, Dr. Gordon Edgren, a psychiatrist. In the ensuing 15 years she received shock treatments and medication therapy prescribed by Dr. Edgren for treatment of her severe depression and suicidal tendencies.

In December 1980, Mrs. Omer began treatment with Dr. Paul Quinnett at the Spokane Community Mental Health Center. She told him of an alleged sexual relationship with Dr. Edgren (which Dr. Edgren denied in his deposition). A suit was commenced alleging the sexual relationship was the direct and proximate cause of damages to the plaintiff, including humiliation, mental anguish, shock, outrage, depression, inconvenience, medical expenses, loss of wages, marital difficulties and general deterioration of emotional well being.

The sole issue on appeal is whether the trial court erred in determining there was no material issue of fact.

■■ For purposes of summary judgment, all disputed facts and reasonable inferences therefrom are resolved in favor of the nonmoving party. *Herskovits v. Group Health Coop.*, 99 Wn.2d 609, 613, 664 P.2d 474 (1983). An appellate court engages in the same inquiry as the trial court, and will review the record and all reasonable inferences therefrom in the light most favorable to the nonmoving party and determine whether any reasonable person could

differ in his conclusion. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). 2 J. Dooley, *Modern Tort Law* § 34.21.50, at 482 (rev. 1983), describes the standard of care imposed upon psychiatrists:

> As a medical specialist, a psychiatrist owes his patients the same duty of care owed by other medical specialists, i.e., a psychiatrist must exercise that degree of care that a reasonably prudent psychiatrist would exercise under the same or similar circumstances. Thus the same general considerations which apply to other physicians and specialists are applicable as well to psychiatrists.

(Footnotes omitted.) *Harris v. Robert C. Groth, M.D., Inc., P.S.,* 99 Wn.2d 438, 439, 663 P.2d 113 (1983) is in accord with Dooley:

> We hold that, as enacted by the Legislature, the standard of care imposed upon health care providers is one of reasonable prudence and that nonphysicians, if otherwise qualified, may give expert testimony in a medical malpractice case.

In *Roy v. Hartogs,* 81 Misc. 2d 350, 366 N.Y.S.2d 297 (1975), a patient sued her psychiatrist alleging the doctor had sexual relations with her as part of the treatment program. The court analyzed this type of case and found it involved a fiduciary relationship between psychiatrist and patient and was analogous to a guardian–ward relationship. The gravamen of the plaintiff's complaint lay in the malpractice, deceit, assault, and coercion by a person in a position of overpowering influence and trust.

> This case involves a fiduciary relationship between psychiatrist and patient and is analogous to the guardian–ward relationship in *Graham v. Wallace* (50 App Div 101, 108) wherein the court stated: "The ward cannot waive performance of this duty or surrender these rights of protection. When the guardian thus betrays his trust and ruins the morals, the character and reputation of his ward, he should not be heard to say in a court of justice, by way of legal excuse or justification for the seduction, that the ward was capable of consenting. Consent obtained under such circumstances is no consent and should stand for naught. It is essential to the preserva-

tion and enforcement of the ward's right of protection in her chastity and virtue that a violation of this right by her guardian should not pass with impunity, but that it should be vindicated and the seducer punished on the civil as well as on the criminal side of the court".

. . .

. . . there is a public policy to protect a patient from the deliberate and malicious abuse of power and breach of trust by a psychiatrist when that patient entrusts to him her body and mind in the hope that he will use his best efforts to effect a cure. That right is best protected by permitting the victim to pursue civil remedies, not only to vindicate a wrong against her but to vindicate the public interest as well.

(Citation omitted.) *Roy v. Hartogs, supra* at 352–54; *see also Mazza v. Huffaker,* 61 N.C. App. 170, 300 S.E.2d 833 (1983); *Nicholson v. Han,* 12 Mich. App. 35, 162 N.W.2d 313, 33 A.L.R.3d 1386 (1968); *Cotton v. Kambly,* 101 Mich. App. 537, 300 N.W.2d 627 (1980).

■ Washington also has characterized the relationship between physician and patient as fiduciary: "The physician–patient relationship is of a fiduciary character. The inherent necessity for trust and confidence requires scrupulous good faith on the part of the physician." *Hunter v. Brown,* 4 Wn. App. 899, 905, 484 P.2d 1162 (1971), *aff'd,* 81 Wn.2d 465, 502 P.2d 1194 (1972) (citing *Lockett v. Goodill,* 71 Wn.2d 654, 430 P.2d 589 (1967)).

The material fact in dispute here is whether the sexual relationship occurred between Mrs. Omer and Dr. Edgren. For purposes of this review, it is presumed such a relationship did occur. The question to be addressed is whether such conduct was the proximate cause of harm to the patient. Experts deposed on behalf of Mrs. Omer differed in their conclusions with respect to the cause of her mental condition. However, Paul Quinnett, Ph.D., director of adult and elderly services at the Spokane Community Mental Health Center and Mrs. Omer's current treating psychologist, offered the following analysis of his patient's condition:

380

Q Doctor, what advice or comments if any did you make to the patient upon discussing with her [her] alleged affair with a former treating psychiatrist?

A I don't recall any specific advice or recommendations that I made. I'd, I believe, thought that treatment was going to be more difficult for both of us if we did not somehow deal with this issue. I had considerable trouble getting her to commit to therapy and to stay alive as was evidenced by seeing her, well, every couple of days there during that first part of the year after Christmas. And I was really concerned that she was not going to stay alive long enough to be of any help to her. And I thought that that—that part of the reason for that may be her fears and concerns about what another therapy relationship might mean or might turn out to be.

. . .

Q Okay. Doctor, was Mary's suicidal activities—by that I mean talking about it, acting out, whatever—in the early part of your relationship with her, motivated in any fashion by guilt feelings on her part?

A Oh, yeah. Yeah.

Q Okay. Did those guilt feelings on her part relate to her relationship with Dr. Edgren?

A I would say yes.

Q Okay. Did Mary appreciate that her relationship with Dr. Edgren was one of the sources of her guilt feelings. I mean, did she express that to you?

A She probably did but I think her perception of where she was most guilty was that she had failed as a mother. She had failed to teach her boys responsibility and had been unable to—and therefore, was unable to sort of control them. And that she had—I believe her separation from her husband hinged on the fact that they didn't agree about how the boys should be parented. And now, whether at that particular moment she, you know, put her relationship with Dr. Edgren together with—with all that, I'm not—I'm not sure. One was—you know, it was certainly one of the factors.

Q But excuse me, it was, in your opinion, from treating Mary during these early months of '81 in her mind at least causative or a contributing, I should say, factor to her guilt feelings?

A Right.

Q Which were contributing factors to her suicidal desires, thoughts?

A Ah–hum.

For purposes of summary judgment, we find evidence from which a fact finder could determine the fiduciary relationship between physician and patient was breached. The testimony of Dr. Quinnett, as viewed in a light most favorable to the nonmoving party, has established a causal relationship between the breach of trust and the patient's condition. The alleged sexual relationship was an assault on a patient who, arguably, was not capable of giving consent to such a relationship.

Dr. Edgren argues that even if there is evidence of a causal relationship between the alleged affair and Mrs. Omer's condition, she was not damaged by the affair. Mrs. Omer testified in her deposition she suffered no loss with respect to medical expenses, lost earnings, or marital difficulties. We note, however, Mrs. Omer claimed general as well as special damages. In *Wenzler & Ward Plumbing & Heating Co. v. Sellen,* 53 Wn.2d 96, 99, 330 P.2d 1068 (1958), the court quoted with approval from *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 90 L. Ed. 652, 66 S. Ct. 574 (1946):

> "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. . . .
>
> "'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights. . . ."

*See also Sigman v. Stevens–Norton, Inc.,* 70 Wn.2d 915, 920, 425 P.2d 891 (1967); *Reynolds Metals Co. v. Electric Smith Constr. & Equip. Co.,* 4 Wn. App. 695, 704, 483 P.2d 880 (1971). Injury flowing from the alleged relationship, though difficult to prove, may be as real as that type of injury which can be proven with mathematical certainty. In *Rasor v. Retail Credit Co.,* 87 Wn.2d 516, 531, 554 P.2d 1041 (1976), the court stated:

Moreover, we emphasize that in instances of injury to reputation, personal humiliation, mental suffering, and similar harm "there need be no evidence which assigns an actual dollar value to the injury." *Gertz v. Robert Welch, Inc.,* [418 U.S. 323, 349, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)] at 350. ""The subject matter being difficult of proof, [the amount of damages] cannot be fixed with mathematical certainty by the proof.'" *Adams v. State,* [71 Wn.2d 414, 432, 429 P.2d 109 (1967)].

(Some citations omitted.)

The summary judgment is reversed; the case is remanded to Superior Court for trial. Respondents' motion to dismiss the appeal as frivolous is denied.

GREEN, A.C.J., and THOMPSON, J., concur.

Reconsideration denied August 21, 1984.