**Jerrie M. SIMMONS, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 85–3835.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 1986.

Decided Dec. 9, 1986.

David A. Summers, Seattle, Wash., for plaintiff-appellee.

Susan L. Barnes, Seattle, Wash., for defendant-appellant.

Before WRIGHT, TANG and REINHARDT, Circuit Judges.

TANG, Circuit Judge:

The Government appeals an award under the Federal Tort Claims Act (FTCA) to a woman who sued because her Indian Health Service counselor wrongfully engaged her in a sexual relationship.  The appeal raises two basic questions: whether Ms. Simmons' claim was barred by the statute of limitations and whether, even if not barred, there was any substantive basis for the Government's liability.  We affirm.

## FACTS

Jerrie Simmons, a member of the Chehalis Tribe, sought mental health consultation from the Indian Health Service and was counseled by Ted Kammers, a social worker. Ms. Simmons had a history of economic deprivation and of physical, sexual and emotional abuse as a child. When she started consultation with Mr. Kammers, she was divorced and pregnant with her fourth child. Ms. Simmons saw Mr. Kammers for counseling from 1973 until August 1980 and maintained the counseling relationship through telephone contacts from then until at least July 9, 1981, the date of her last face-to-face counseling session.

In October 1978 Mr. Kammers initiated romantic contact with Ms. Simmons during a counseling session, encouraging her to act on her professed feelings of attraction to him. In January 1979 he had sexual intercourse with her during an out-of-town trip and this romantic and sexual relationship continued during the course of Ms. Simmons' treatment.

In January 1980, the Tribal Chairwoman notified Mr. Kammers' supervisor, Victor Sansalone, of her concerns about the relationship between Ms. Simmons and Mr. Kammers. Sansalone took no action either to correct Mr. Kammers' improper counseling or to relieve him of his duties. In August 1980 Ms. Simmons moved to Seattle and began eventually to suffer a variety of emotional problems, ranging from anxiety to depression, which worsened until she was hospitalized for psychiatric treatment in May 1982. She finally attempted suicide in November 1982.

In February 1983 Ms. Simmons learned, through psychiatric consultation with Dr. Patricia Lipscomb, M.D., that her counselor's misconduct was the cause of her psychological problems and that her problems were due essentially to his inappropriate response to the normal "transference phenomenon" in therapy.

On May 23, 1983 Ms. Simmons filed an administrative claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671–2680 (1982), based on Mr. Kammers' negligence while counseling her in his capacity as a social worker employed by a United States agency. More than six months elapsed without final disposition of her claim by the Public Health Service of the United States Department of Health and Human Services, so Ms. Simmons filed her tort claim in district court on December 23, 1983. 28 U.S.C. § 2675(a). After a bench trial, the district court entered findings and conclusions (summarized above) and judgment for Ms. Simmons, awarding her damages of $150,000. The Government timely appeals.

## DISCUSSION

### I. Transference Phenomenon

The Government argues that Ms. Simmons' action is time-barred because she knew her injury and its cause more than two years before she filed her claim. The Government also contends Mr. Kammers' improper conduct was not within the scope of his employment and thus the Government cannot be held liable under the doctrine of *respondeat superior.* To answer the questions of when Ms. Simmons understood the cause of her injury and whether Mr. Kammers' conduct was within the scope of his employment requires an understanding of the nature of the transference phenomenon and the consequence of a therapist's mishandling of the phenomenon.

Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is "generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past." *Stedman's Medical Dictionary* 1473 (5th Lawyers' Ed.1982). Transference "is perhaps regarded as the most significant concept in psychoanalytical therapy, and one of the most important discoveries of Freud." *Zipkin v. Freeman,* 436 S.W.2d 753, 755 n. 1 (Mo.1968) (quoting Noyes & Kolb, *Modern Clinical Psychiatry* 505 (6th ed. 1963)).

As Dr. Laura Brown, the clinical psychologist who treated Ms. Simmons, testified at trial,

> What the notion of transference assumes is that as therapy develops, and if therapy is working, the client comes to either consciously or unconsciously, or both, regard the therapist as a child might regard the parent. This is important because in order for a therapist to have positive powerful impact in helping the client to change and heal, the therapist has to have the same kind of authority power in a positive way with the client that the parents once had, or the parental figures once had in a negative way with the client while the client was growing up. And, so what happens when therapy is working ... is that this transference relationship grows so that the client comes to experience the therapist as a powerful, benevolent parent figure. And, what that means is that you've got a symbolic, sometimes conscious sometimes not, parent-child relationship existing in the therapy setting, even though you have two adults there.

Transference is crucial to the therapeutic process because the patient "unconsciously attributes to the psychiatrist or analyst those feelings which he may have repressed towards his own parents.... [I]t is through the creation, experiencing and resolution of these feelings that [the patient] becomes well." *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174, 177 (Wis.App.1984) (quoting D. Dawidoff, *The Malpractice of Psychiatrists* 6 (1973)). "Inappropriate emotions, both hostile and loving, directed toward the physician are recognized by the psychiatrist as constituting ... the transference. The psychiatrist looks for manifestations of the transference, and is prepared to handle it as it develops." *L.L.*, 362 N.W.2d at 177 (quoting Heller, *Some Comments to Lawyers on the Practice of Psychiatry*, 30 Temp.L.Q. 401, 401–02 (1957)). "Understanding of transference forms a basic part of the psychoanalytic technique." *Zipkin*, 436 S.W.2d at 755 n. 1 (quoting Blakiston's *New Gould Medical Dictionary* 1260 (2d ed. 1956)). The proper therapeutic response is countertransference, a reaction which avoids emotional involvement and assists the patient in overcoming problems. *Aetna Life & Casualty Co. v. McCabe*, 556 F.Supp. 1342, 1346 (E.D.Pa.1983).

When the therapist mishandles transference and becomes sexually involved with a patient, medical authorities are nearly unanimous in considering such conduct to be malpractice. *L.L.*, 362 N.W.2d at 176–77 (citing Davidson, *Psychiatry's Problem with No Name: Therapist-Patient Sex*, 37 Am.J.Psychoanalysis 43, 48–49 (1977) ("[I]t is generally agreed that therapist-patient sex is psychologically deleterious for the involved woman patient and is unethical practice for the male practitioner."); Stone, *The Legal Implications of Sexual Activity Between Psychiatrist and Patient*, 133 Am.J.Psychiatry 1138, 1139 (1976) ("[T]he experts would ... agree ... that 'there are absolutely no circumstances which permit a psychiatrist to engage in sex with his patient.' All such instances constitute misuse of the transference.")). Dr. Brown explained at the trial that the reason sexual involvement with a patient is so harmful is due to the "parent-child" relationship symbolized by the transference. As she stated, "were a therapist to be sexual with a client it would be replicating at a symbolic level the situation in which a parent would be sexual with a child. The kinds of harm that can flow from those sorts of violations of trust are very similar."

Courts have uniformly regarded mishandling of transference as malpractice or gross negligence. *See, e.g., Vigilant Insurance Co. v. Employers Insurance of Wausau*, 626 F.Supp. 262 (S.D.N.Y.1986); *Aetna Life & Casualty Co. v. McCabe*, 556 F.Supp. 1342 (E.D.Pa.1983); *Waters v. Bourhis*, 40 Cal.3d 424, 709 P.2d 469, 220 Cal.Rptr. 666 (1985); *Horak v. Biris*, 130 Ill.App.3d 140, 85 Ill.Dec. 599, 474 N.E.2d 13 (1985); *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174, 176–78 (1984); *St. Paul Fire & Marine Insurance Co. v. Mitchell,*, 164 Ga.App. 215, 296 S.E.2d 126 (1982); *Cotton v. Kambly*, 101 Mich.App. 537, 300 N.W.2d 627 (1980); *Roy v. Hartogs*, 85 Misc.2d 891, 381 N.Y.S.2d

587 (1976); *Seymour v. Lofgreen*, 209 Kan. 72, 495 P.2d 969 (1972); *Zipkin v. Freeman*, 436 S.W.2d 753 (Mo.1968). We note that courts do not routinely impose liability upon physicians in general for sexual contact with patients. *See, e.g., Smith v. St. Paul Fire and Marine Insurance Co.*, 353 N.W.2d 130, 132 (Minn.1984).

The crucial factor in the therapist-patient relationship which leads to the imposition of legal liability for conduct which arguably is no more exploitative of a patient than sexual involvement of a lawyer with a client, a priest or minister with a parishioner, or a gynecologist with a patient is that lawyers, ministers and gynecologists do not offer a course of treatment and counseling predicated upon handling the transference phenomenon. *See* A. Stone, M.D., *Law, Psychiatry, and Morality* 199 (1984).

Against this background we turn to a consideration of when Ms. Simmons first learned of her injury and its cause and of whether Mr. Kammers was acting within the scope of his employment when he caused her injuries.

## II. Statute of Limitations

The search for the appropriate statute of limitations is a decision of law which we review *de novo*. *Edwards v. Teamsters Local Union No. 36*, 719 F.2d 1036, 1039 (9th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). The question of whether statute of limitations conditions have been met under the FTCA is one of federal law.[1] *See, e.g., In re Swine Flu Products Liability Litigation*, 764 F.2d 637, 638–39 (9th Cir.1985). A tort claim against the United States must be filed within two years. 28 U.S.C. § 2401(b) (1982). The general rule in malpractice cases is that the statutory period begins to

run when the plaintiff discovers both the existence and cause of injury. *United States v. Kubrick*, 444 U.S. 111, 113, 123–24, 100 S.Ct. 352, 354, 360, 62 L.Ed.2d 259 (1979). The district court held that Ms. Simmons' May 23, 1983 tort claim was timely because it found that she first knew of her injuries and their cause sometime between February and March 1983.

Clearly the court chose the appropriate two-year statute of limitations period. Our task is to determine whether the district court's findings as to Ms. Simmons' injury, its cause, and the date of her knowledge of each were clearly erroneous. Fed.R.Civ.P. 52(a). We hold that they were not, because a review of the record does not leave us with the "conviction that a mistake has been committed." *Pullman-Standard v. Swint*, 456 U.S. 273, 284–85 n. 14, 102 S.Ct. 1781, 1787–88 n. 14, 72 L.Ed.2d 66 (1982).

The Government contends that the district court applied the discovery rule incorrectly to the facts in this case. The Government argues that Ms. Simmons' injury is the emotional pain she suffered immediately after first having sexual intercourse with Mr. Kammers in January 1979. According to the Government her cause of action accrued early in 1979, or at the latest, in the Fall of 1979 when gossip about her and Mr. Kammers began to cause her embarrassment and humiliation.

The Government argues that the district court's decision that she first knew the cause of injury between February and March 1983 effectively delays the time of accrual of her cause of action until she had knowledge of Mr. Kammers' legal fault, which this court held is impermissible in *Fernandez v. United States*, 673 F.2d 269, 272 (9th Cir.1982). In *Fernandez* the plaintiff suffered deafness caused by inade-

---

1. Because the statute of limitations question is one of federal law, the recent decision of the Washington Supreme Court, *Tyson v. Tyson*, 107 Wash.2d 72, 727 P.2d 226 (1986) is inapposite. The court held that under Washington law the discovery rule does not apply to an intentional tort claim by a victim who has blocked from her conscious memory during the statutory period an incident of sexual abuse. *Id.* at 79–80, 727

P.2d at 229–30. The court's primary rationale was that the passage of seventeen years since the now remembered incident made it virtually impossible to verify independently the plaintiff's allegations. *Id.* Even if state law applied in our case, the *Tyson* decision would not control the outcome because there was ample independent evidence to verify Ms. Simmons' allegations.

quate treatment of jaundice as an infant and, through his parents, he knew his physical injury and its cause twelve years before he made a claim. *Fernandez* is thus distinguishable from the instant case because Ms. Simmons did not know Mr. Kammers' conduct caused her emotional injury until another doctor so informed her in February 1983. It was not knowledge of his legal fault that she gained in 1983, but knowledge of the fact that his mishandling of her normal transference had caused her psychological damage.

The Government also cites *Davis v. United States*, 642 F.2d 328, 331 (9th Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1273, 71 L.Ed.2d 459 (1982) for the proposition that a plaintiff has the burden of ascertaining the existence and source of fault within the statutory period once the fact of injury and its cause are known. This argument is no different from the *Fernandez* argument except that here the Government says Ms. Simmons knew "her love affair with a married man who had no intention of divorcing his wife was emotionally hurting." This characterization of her injury and its cause misses the point of the complaint of negligence by a mental health professional.

The district court found that Ms. Simmons' injuries were the anxiety and despair which led to her hospitalization and attempted suicide and the deep depression she experienced due to what her doctor diagnosed as post-traumatic stress syndrome. She did not know until February 1983, when her psychiatrist first diagnosed her problem, that her counselor's improper handling of the transference phenomenon had caused the emotional and psychological damage she suffered. The district court found her cause of action under *Kubrick* did not accrue until February 1983 and thus her claim, filed in May of 1983, was within the limitations period.

The district court heard testimony both from Dr. Lipscomb, the psychiatrist who first diagnosed Ms. Simmons in February, and Dr. Brown, who began treating her in March of 1983. Both diagnosed her as suffering from post-traumatic stress disorder caused by the unethical conduct of Mr. Kammers, and both indicated that she had no idea, until Dr. Lipscomb first told her, that her emotional condition had been caused by that conduct. Both witnesses indicated that until Dr. Lipscomb informed her that Mr. Kammers' conduct caused her injury she believed that what had occurred had "happened because she was a terrible person" or because she was "a very bad person, a worthless person, a guilty person." Dr. Brown elaborated that, "she suffered great guilt and shame. She began again ... to think of herself as a very bad person, particularly as a sexually bad person, someone who was sexually dirty, or degraded, or whorish."

After consideration of all the testimony, the district court found:

The impacts of sexual involvement with one's counselor are more severe than the impacts of merely "having an affair" for two major reasons: first, because the client's attraction is based on transference, the sexual contact is ordinarily akin to engaging in sexual activity with a parent, and carries with it the feelings of shame, guilt and anxiety experienced by incest victims. Second, the client is usually suffering from all or some of the psychological problems that brought him or her into therapy to begin with. As a result, the client is especially vulnerable to the added stress created by the feelings of shame, guilt and anxiety produced by the incestuous nature of the relationship, and by the sense of betrayal that is felt when the client eventually learns that she is not "special" as she had been led to believe, and that her trust has been violated.

These factual findings as to the nature and cause of her injury are fully supported by the record and we cannot say that, as a matter of law, Ms. Simmons was on notice or ought to have been on notice of her injury and its cause more than two years before she brought suit.

This is not a case in which we can say, despite the factual findings, that Ms. Simmons should have known the cause of her injuries at an earlier date. We agree with the reasoning in a similar case of psychiat-

ric malpractice, that "where the injury and cause thereof are subtler and more complicated than in the normal malpractice case, it seems particularly inappropriate to determine as a matter of law what the plaintiff should have known." *Greenberg v. McCabe*, 453 F.Supp. 765, 772 (E.D.Pa. 1978), *aff'd* 594 F.2d 854 (3d Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 79, 62 L.Ed.2d 51 (1979). In *Greenberg* the court found the plaintiff's delayed knowledge of the cause of her condition explainable in light of three factors: (1) the dependence on her therapist inherent in the normal transference, which impeded her ability to view his treatment as in any way related to her psychological damages; (2) his assurances that his therapy was proper; and (3) the continuation of the therapy relationship, which made it unreasonable to expect her to independently investigate the cause of her problems. 453 F.Supp. at 771–772. Similarly, Ms. Simmons' transference and dependence made it very difficult for her to believe that anything Mr. Kammers had done caused her emotional damage; rather, as the court found, she blamed herself for her problems.

We consider Ms. Simmons' situation clearly distinguishable from that of the plaintiffs in *Seymour v. Lofgreen*, 209 Kan. 72, 495 P.2d 969 (1972) and *Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389 (1980). In *Seymour*, the Supreme Court of Kansas upheld the dismissal of a suit as time-barred because, in considering a limitations period which begins to run when an injury becomes reasonably ascertainable, the court found the record was clear that the plaintiff in a transference malpractice case knew the fact and cause of her injury when "having changed doctors, she began a new course of treatment." 495 P.2d at 973. In *Decker* the Maryland Court of Appeals held a woman's claim of transference malpractice time-barred because three different psychiatrists told her between April and September of 1973 that her prior therapist's "sexual involvement with her was grossly unprofessional, improper and harmful to her mental and emotional well being," thus leaving her with "no legal excuse" for her failure to file her medical

malpractice action until after the expiration of three years. 422 A.2d at 394–95.

■ In the case at bar, Ms. Simmons commenced legal action three months after the first time she learned her counselor's conduct caused her emotional injury. We stress that what she knew and when she knew it are questions of fact. The record fully supports the factual conclusions drawn by the district court. Because the facts as found by the district court are not clearly erroneous we hold that it correctly applied the rule of *Kubrick* in finding Ms. Simmons' claim was timely filed.

Because we agree the claim falls within the *Kubrick* rule, we do not address Ms. Simmons' alternative argument that we should adopt a continuing tort doctrine in such a case and toll the statute of limitations for the duration of the treatment period. *See Page v. United States*, 729 F.2d 818, 822–23 (D.C.Cir.1984) (holding a cause of action does not accrue until allegedly tortious conduct comes to a halt when there is a course of "continuous conduct accreting physical and mental injury that justifies characterization as a continuing tort.").

## III. Scope of Employment

The determination of liability under the FTCA is controlled by the law of the place where the allegedly tortious acts occurred. 28 U.S.C. § 1346(b) (1982); *Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955). We review the district court's application of state law *de novo*. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). We accord deference to the underlying factual determinations of the trier of fact because whether a tortious act was performed within the scope of the servant's employment "is a determination which necessarily depends upon the particular circumstances and facts of the case." *Kuehn v. White*, 24 Wash.App. 274, 600 P.2d 679, 683 (1979).

There is no question that a mental health professional's sexual involvement with a client is a breach of duty and malpractice under Washington law. *Omer v. Edgren*,

38 Wash.App. 376, 685 P.2d 635, 637 (1984). But the liability of the Government for Mr. Kammers' conduct depends upon whether his conduct was within the scope of his employment. Washington agency law has long held that a master cannot excuse himself when any "authorized act was improperly or unlawfully performed" *De Leon v. Doyhof Fish Products Co.,* 104 Wash. 337, 343, 176 P. 355, 357 (1918), nor can he excuse himself when an unauthorized act is done in conjunction with other acts which are within the scope of duties the employee is instructed to perform. *Pierson v. United States,* 527 F.2d 459, 464 (9th Cir.1975); *Smith v. Leber,* 34 Wash.2d 611, 623, 209 P.2d 297, 303 (1949).

In a recent case discussing scope of employment, the Washington Supreme Court reiterated the test for determining whether an employee was within the course of his employment as:

> whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment; *or* by specific direction of his employer; *or,* as sometimes stated, *whether he was engaged at the time in the furtherance of the employer's interest.*

*Dickinson v. Edwards,* 105 Wash.2d 457, 716 P.2d 814, 819 (1986) (quoting *Elder v. Cisco Construction Co.,* 52 Wash.2d 241, 245, 324 P.2d 1082 (1958)) (emphasis in original). The Washington court has emphasized the importance of the benefit to the employer in applying this test. *Dickinson,* 716 P.2d at 819. In *Dickinson* the court applied *respondeat superior* to allow a plaintiff injured by a drunk employee to recover from a banquet-hosting employer who required the employee's attendance at a party furthering the employer's interest. *Id.* at 820. In so holding, the court noted that acts in violation of company policy, negligent acts performed contrary to instructions, and acts "forbidden, or done in a forbidden manner," may create employer liability. *Id.* at 821 (quoting Restatement (Second) of Agency § 230 (1958)).

■ We believe these principles support the district court's determination that Ted Kammers was acting within the scope of his employment in providing mental health counseling to Ms. Simmons, and that his unprofessional conduct in providing those services was the cause of her injury.

The Government advances five arguments against applying the doctrine of *respondeat superior* in this case. First it says Mr. Kammers' conduct was unauthorized and did not serve his employer's interests since the Government did not hire him to "have an affair" with anyone. The Government relies on *Elder v. Cisco Construction Co.,* 52 Wash.2d 241, 324 P.2d 1082 (1958) for its interpretation of serving an employer's interests. In that case some construction workers were injured in a car wreck while on their way home from work. The accident occurred three hours after they left work in one of the employee's private automobiles for which he received no money for mileage, maintenance or transportation costs. Because the employer had no control over the employee's transportation, his car, or the employee at the time of the accident, the court found his conduct was not in furtherance of his employer's interest. *Id.,* 324 P.2d at 1085–86.

In the instant case, Mr. Kammers was employed to provide mental health counseling and although he was not authorized to become sexually involved with his clients, that contact occurred in conjunction with his legitimate counseling activities and thus is within the rule of *Smith v. Leber,* 34 Wash.2d 611, 209 P.2d 297 (1949).

In this connection it is instructive to consider the analogous argument offered in many psychiatric malpractice cases that sexual contact with patients is unethical and unprofessional and therefore not covered by a practitioner's malpractice insurance, which typically covers only "the rendering of or failing to render professional services." *Vigilant Insurance Co. v. Employers Insurance of Wausau,* 626 F.Supp. 262, 265 (S.D.N.Y.1986). The majority of courts which have considered this question have held that the policies cover the sexual conduct "as long as the sexual conduct is related to therapy." *Id. And see, Zipkin*

*v. Freeman*, 436 S.W.2d 753 (Mo.1968); *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174 (1984). The *Vigilant* court was convinced that inappropriate sexual conduct was a form of covered malpractice in the case of a psychiatrist because "the transference phenomenon renders the patient particularly vulnerable." 626 F.Supp. at 265. The Wisconsin Supreme Court emphasized that:

> a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them. The transference phenomenon makes it impossible that the patient will have the same emotional response to sexual contact with the therapist that he or she would have to sexual contact with other persons. Further, by introducing sexual activity into the relationship, the therapist runs the risk of causing additional psychological damage to the patient.

*L.L.*, 362 N.W.2d at 178.

For much the same reason, we believe the centrality of transference to therapy renders it impossible to separate an abuse of transference from the treatment itself. The district court correctly found that the abuse of transference occurred within the scope of Mr. Kammers' employment.

The Government's second argument is closely related to the first in that it says Mr. Kammers' allegedly negligent acts did not occur within the time and space of his employment since the instances of sexual intercourse occurred during out-of-town trips. This contention is without merit. The district court found Mr. Kammers' negligence to be his mishandling of the normal transference phenomenon. His romantic and sexual overtures, kissing and touching occurred during the therapy sessions, thus some of his negligent acts did occur during his working hours.

The Government also urges that the district court improperly made the employer's legal responsibility coextensive with the ethical standards of the mental health profession. However, the district court merely said that in this case a mental health counselor's conduct fell below widely accepted professional standards, and imposed derivative liability on his employer. The Government's assumption is that the court imposed liability on the employer for conduct outside the scope of employment, thus holding the employer to an ethical standard which governs "off duty" conduct as well as conduct within "business hours." There is no indication that the district court made these distinctions. It found Kammers' conduct to be negligent in toto, and at least some of his negligent acts occurred during therapy sessions, and all arose out of the ongoing therapy relationship he had with Ms. Simmons.

The Government apparently also argues that Mr. Kammers' conduct was not negligent and was not malpractice because he did not encourage Ms. Simmons to become sexually involved with him as a form of therapy. We have discovered no case, and the Government cites none, which suggests this is an element of the negligent act in a malpractice case. Although such a suggestion is often part of the factual pattern in such cases, it is not a necessary element of the cause of action.

Finally, the Government argues that *Andrews v. United States*, 732 F.2d 366 (4th Cir.1984), should control the outcome here. In *Andrews* the defendant was a physician's assistant who told a woman who complained of a sinus condition that her real problem was depression which could be cured by a sexual relationship with him. *Id.* at 367–68. The court found he could not have considered "his sexual adventures to be a bona fide part of the therapy he was employed to provide" and thus he was simply furthering his self-interest, not his employer's business. *Id.* at 370. The court found that the defendant's actions amounted to medical malpractice but that they were not within the scope of his employment, and it thus rested the employer's liability on the negligence of the supervisor rather than on that of the physician's assistant. *Id.* at 371.

The *Andrews* decision is distinguishable from the case at bar for two reasons. First, the *Andrews* court applied South

Carolina law, which holds that "the servant must not only be acting in the course of his employment, or within the scope of his authority, but must be actually engaged in his employer's business at the time of injury." 732 F.2d at 370 (quoting *Porter v. United States*, 128 F.Supp. 590, 595 (D.S. C.), *aff'd*, 228 F.2d 389 (4th Cir.1955) (interpreting South Carolina law). This is a narrower test of scope of employment than exists under Washington law. The second distinction is factual. The essence of Mr. Kammers' malpractice was his mishandling of Ms. Simmons' transference. There was no transference in the *Andrews* case. In *Andrews* the physician's assistant suggested a sexual involvement to a patient upon her second visit to the clinic, during her first counseling session with him. As egregious as his conduct was found to be, it did not amount to an abuse of a trusting dependency relationship such as that which had evolved during Jerrie Simmons' five years of successful therapy with Ted Kammers.

The district court correctly applied Washington principles of *respondeat superior* in this case.

## IV. Supervisory Negligence

 The district court's finding of supervisory negligence as a proximate cause of Ms. Simmons' injuries is a factual finding entitled to considerable deference. The teaching of *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) is that a finding of negligence is a mixed question to be reviewed by the clearly erroneous standard.

Mr. Kammers' supervisor, Victor Sansalone, was informed of the situation between the counselor and Ms. Simmons in January 1980. Since the counseling relationship continued until July 1981, the district court found Mr. Sansalone was negligent in failing to do anything to prevent further harm to Ms. Simmons. Under the Fourth Circuit decision in *Andrews* Government liability is predicated on such supervisory negligence. 732 F.2d at 371. In *Andrews* the supervising physician knew of certain "sexual improprieties" before intercourse occurred.

The Government here argues the *Andrews* defendant's negligence lay in not preventing harm which had not yet occurred, thus attempting to distinguish the instant case, wherein intercourse had occurred before Mr. Sansalone was aware of the situation. This distinction is unhelpful in that the district court found Ms. Simmons to have suffered psychological damage from the whole course of Mr. Kammers' conduct, at least a portion of which should have been averted by Mr. Sansalone's intervention.

Under Washington law, liability for supervisory negligence is imposed on one who should have known of the negligent acts of a subordinate. *See La Lone v. Smith*, 39 Wash.2d 167, 171, 234 P.2d 893 (1951). It is arguable that Mr. Sansalone should have supervised Mr. Kammers more closely so that he would have been aware of the situation at a much earlier date.

Although it is not clear which standard the district court applied, the factual finding of supervisory negligence is not clearly erroneous. Thus we affirm the judgment of the district court imposing liability on this ground as well.

## V. Damages

The Government's final argument is that the district court should have limited Ms. Simmons' damage award to damages for incidents after May 1981. *Kubrick* does not support such a policy of apportioning a total damage award to separate specific acts of negligence.

## CONCLUSION

The judgment of the district court is AFFIRMED.