**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEXANDRIA GREGG, Individually and on Behalf of All Others Similarly Situated, *Plaintiff-Appellant*, | No. 14-16785 D.C. No. 1:14-cv-00056-JMS-KSC |
| v. | |
| STATE OF HAWAII, DEPARTMENT OF PUBLIC SAFETY; TED SAKAI, in his official capacity as Director of the Department of Public Safety, State of Hawaii; NEAL WAGATSUMA, in his official capacity as Warden of the Kauai Community Correctional Center, Department of Public Safety, State of Hawaii, and in his individual capacity, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, Chief Judge, Presiding

Argued and Submitted June 15, 2017
Honolulu, Hawaii

Filed August 29, 2017

Before:  Raymond C. Fisher, Richard A. Paez
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Fisher

**SUMMARY**[*]

**Civil Rights**

The panel vacated the district court's dismissal of a 42 U.S.C. § 1983 action brought by a former Hawaii inmate who alleged that she was psychologically traumatized as a result of being compelled to undergo sexual shame therapy at a Hawaii correctional facility, and remanded.

The district court held that because plaintiff experienced feelings of embarrassment and humiliation contemporaneously with her therapy sessions, her claims accrued on the last date that the sessions occurred in November 2011. The district court dismissed plaintiff's Eighth Amendment claims filed on January 31, 2014 under the applicable two-year statute of limitations and denied her request for leave to amend her complaint.

Applying *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986), the panel held that the district court erred in denying plaintiff leave to amend to try to make a plausible showing that it was not until January 2012 that she first became aware of her injuries from her purported treatment

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

in the therapy program. The panel held that it may be reasonable for an incarcerated individual who is told she must resurface past sexual traumas to overcome them to rely on these assurances, and to view associated feelings of emotional distress as normal, constructive responses incidental to the healing process. The panel held that like the plaintiff in *Simmons*, plaintiff in this case may be able to allege facts making it plausible she neither knew nor reasonably should have known she was injured by the therapy program until sometime after she stopped participating in the sessions.

## COUNSEL

Margery S. Bronster (argued), Andrew L. Pepper, Robert Hatch, and Anthony Quan, Bronster Hoshibata, Honolulu, Hawaii; Dan Hempey, Hempey & Meyers, Lihue, Kauai, Hawaii; for Plaintiff-Appellant.

Marie Manulele Gavigan (argued) and Caron M. Inagaki, Deputy Attorneys General; Douglas S. Chin, Attorney General; Department of the Attorney General, Honolulu, Hawaii; for Defendants-Appellees.

## OPINION

FISHER, Circuit Judge:

Alexandria Gregg learned she had psychological disorders years after she underwent sexual shame therapy sessions at a Hawaii correctional facility. Because Gregg experienced feelings of embarrassment and humiliation contemporaneously with her therapy sessions, the district

court held her claims accrued on the last date that the sessions occurred. The district court dismissed her Eighth Amendment claims asserting cruel and unusual punishment and deliberate indifference under the applicable two-year statute of limitations and denied her request for leave to amend her complaint. We address when her claims accrued. Under federal law, a claim accrues when a plaintiff knows or has reason to know of the injury that is the basis of the action and the cause of that injury. *See Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 581 (9th Cir. 2012); *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). Here, Gregg may be able to allege she was unaware of her injuries until sometime after she stopped participating in the therapy sessions. *See Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986). That is, she may have reasonably viewed the embarrassment and humiliation she felt as the ordinary, and hence not harmful, response to therapy. We hold the district court erred in denying as futile Gregg's request for leave to amend to include new assertions to this effect, and we vacate and remand.

## I.  Background

### A.  Factual Allegations

Gregg was periodically incarcerated at the Kauai Community Correctional Center (KCCC) in Hawaii between March and November 2011. Her first amended complaint alleges the following facts about her experience there.

Gregg participated in Life Time Stand (LTS), a program run by Warden Neal Wagatsuma. The program purported to provide "therapy, counseling, and mental health treatment" for women inmates. Those who joined the program and

complied with its requirements were housed in less restrictive jail environments. The LTS sessions involved "public sexual shamings." Inmates were forced to stand at a lectern and speak about their sexual histories before large groups of men and women inmates and staff. For example, Warden Wagatsuma asked Gregg "whether she had sex while on drugs," "how many partners [she] previously had sex relations with," and "whether she had been raped." He then "ordered her to elaborate on previous incidents of rape" in which she was the victim. Inmates were required to hold up "sexual photographs" of themselves while Wagatsuma called them "whores." These sessions were videotaped and shown to the broader inmate population.

On one occasion, Wagatsuma showed a scene from the film *Irreversible* (StudioCanal 2002) depicting the anal rape of a young woman at knife point. Film critic Roger Ebert described the scene as "so violent and cruel that most people will find it unwatchable."

These experiences "humiliated, embarrassed, and violated" Gregg, causing her to request a transfer to a different correctional facility. After her request was granted, Gregg remained incarcerated at a separate facility from November 2011 until her release from custody in May 2012. By the time she filed her complaint, Gregg had become "psychologically, emotionally, and physically traumatized" by her participation in the program.

## B. Procedural History

Gregg filed her original class action complaint under 42 U.S.C. § 1983 on January 31, 2014. Her first amended complaint alleges, as relevant here, claims for cruel and

unusual punishment and deliberate indifference to substantial risk of serious harm under the Eighth Amendment.[1]

The defendants moved under Rule 12(b)(6) to dismiss and under Rule 12(c) for judgment on the pleadings, arguing Gregg's claims were untimely. Gregg subsequently sought leave to amend her first amended complaint to include new factual allegations, submitting a pair of declarations in support. In the first, Gregg said she "remained unaware of [her] injuries until well after [her] release [from custody] in May of 2012." After her release, she began to consult therapists to help process her experience. Toward the end of 2012, she met a former KCCC therapist who encouraged her to seek professional psychological help. Gregg followed this advice and, in early 2014, began to see Fran Tyson-Marchino, a therapist who diagnosed Gregg with "traumatic experience and adjustment disorders" caused by her participation in the LTS program. In the second declaration, Tyson-Marchino stated her professional opinion that Gregg's psychological conditions were "directly attribut[able] . . . to the trauma and sexual egregious acts Ms. Gregg experienced while she was incarcerated."

The district court granted the defendants' motions to dismiss and for judgment on the pleadings. Because the first amended complaint alleged Gregg experienced feelings of embarrassment and humiliation contemporaneously with her participation in the LTS program, the court concluded her claims – brought two years and two months after the sessions ended – were untimely under the applicable two-year statute

---

[1] Her complaint also included federal claims premised on retaliation and discrimination, and claims under state law. She does not challenge dismissal of these claims on appeal.

of limitations. The court ruled Gregg's claims accrued "when she was aware that she suffered injury from Defendants, and the fact that it was not until later that [Gregg] was formally diagnosed and/or that she learned the full extent of injury does not make the accrual date a moving target." The court also denied as futile Gregg's request for leave to amend. This appeal followed.

## II. Standard of Review

We review de novo the district court's dismissal of an action on statute of limitations grounds, *see Mann v. Am. Airlines*, 324 F.3d 1088, 1090 (9th Cir. 2003), accepting all factual allegations in the complaint as true and drawing "all reasonable inferences in favor of the nonmoving party," *TwoRivers*, 174 F.3d at 991. The allegations must "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Because a Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion, "'the same standard of review' applies to motions brought under either rule." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)). A judgment on the pleadings is properly granted when, "taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998).

"When the district court denies leave to amend because of futility of amendment, we will uphold such denial if 'it is clear, upon *de novo* review, that the complaint would not be saved by any amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010) (quoting *Leadsinger,*

*Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)).

## III. Discussion

The parties agree a two-year statute of limitations applies to Gregg's § 1983 claims. The issue is when her claims accrued. Because Gregg filed her complaint in January 2014, her claims are untimely if they accrued before January 2012. The district court ruled the claims accrued when Gregg stopped participating in the LTS sessions in November 2011. For the reasons that follow, we disagree that this is necessarily the case. If Gregg neither knew nor should have known of her injuries until after January 2012, her claims are timely.

The accrual date of a § 1983 claim is a matter of federal law, "governed by federal rules conforming in general to common-law tort principles." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). The general common law principle is that a cause of action accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action and the cause of that injury. *See Bonneau*, 666 F.3d at 581; *TwoRivers*, 174 F.3d at 991; *see also TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001) (observing that "lower federal courts generally apply a discovery accrual rule when a statute is silent on the issue" (internal quotation marks omitted)); *Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999) (as amended) ("[T]he discovery rule has been observed as a matter of federal law."). A plaintiff "must be diligent in discovering the critical facts." *Bibeau*, 188 F.3d at 1108. A cause of action accrues even if "the full extent of the injury is not then known." *Wallace*, 549 U.S. at

391 (quoting 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526–27 (1991)).

The issue here, then, is when Gregg knew, or in the exercise of reasonable diligence should have known, of the injuries forming the basis for her action and their cause. The government argues that, because Gregg's claims are for injuries she sustained from her incarceration at KCCC, which ended in November 2011, her claims could not have accrued any later than that date. Gregg, on the other hand, argues she was unaware of her injuries and their cause until she consulted a professional therapist in 2014. Although she experienced feelings of embarrassment and humiliation contemporaneously with her participation in the LTS program, Gregg maintains she was unable to recognize these feelings as injuries until well after her release from custody. She argues she was "prevented from connecting Defendants' misconduct with her latent psychological illnesses" because she was "under the guise of therapy" and "under the spell of her abusive counselor." Although she "may have unknowingly dealt with psychological symptoms while she was in custody at KCCC," she says "she did not have the capacity to recognize . . . that these symptoms were not merely a normal immediate reaction to intense therapy." She says she "remained unaware of [her] injuries until well after [her] release [from custody] in May of 2012."

Gregg's argument is supported by our decision in *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986). There, the plaintiff (Simmons) had a history of physical, sexual and emotional abuse and sought treatment from a government counselor (Kammers). *See id.* at 1364. Simmons maintained a counseling relationship with Kammers from

1973 until 1981. *See id.* Beginning in 1978, Kammers initiated a sexual relationship with Simmons as well. *See id.*

In 1980, Simmons began to experience a variety of psychological problems, ranging from anxiety to depression, which worsened until she was hospitalized for psychiatric treatment in 1982. *See id.*

In 1983, Simmons learned through psychiatric counseling that Kammers' misconduct was the cause of her psychological problems and that her problems were due essentially to Kammers' inappropriate response to the normal "transference phenomenon" in therapy. *See id.*[2] Simmons was eventually diagnosed with post-traumatic stress disorder caused by Kammers' unethical conduct, *see id.* at 1367, and she filed a claim later that year for medical malpractice under the Federal Tort Claims Act, *see id.* at 1364.

After a bench trial, the district court found Simmons first discovered her injuries and their cause in 1983 when she learned, through psychiatric consultation, that Kammers' misconduct was the cause of her psychological conditions. *See id.* at 1366. Before that date, Simmons was unaware she had suffered any injuries. Instead, she "blamed herself for her problems," *id.* at 1368, believing she was a "worthless person," *id.* at 1367 (internal quotation marks omitted). Even if Simmons were to have recognized her injuries before 1983,

---

[2] Transference denotes a patient's emotional reaction to a therapist and generally describes the projection of feelings onto the therapist, who has come to represent someone from the patient's past. *See Simmons*, 805 F.2d at 1364. When a therapist mishandles transference and becomes sexually involved with a patient, medical authorities are nearly unanimous in considering such conduct malpractice. *See id.* at 1365.

the district court found she would have been unaware of the cause of her conditions. *See id.* at 1367 (explaining that Simmons had "no idea," until her psychiatrist first told her, that her emotional injury was "caused by" Kammers' conduct).

We affirmed, holding the district court's findings as to the nature and cause of Simmons' injury were fully supported by the record. *See id.* We agreed both that Simmons did not actually know of her injuries and their cause and that a reasonable person should not have. We discussed a number of reasons why, in the therapy context, it may be reasonable for a patient to first discover her injuries long after the events that caused them. The high degree of dependence and trust of a patient on her therapist, for example, often impedes the ability to view treatment "as in any way related to her psychological damages." *Id.* at 1368. This special relationship, in other words, sometimes prevents the patient from questioning the wrongful activity or recognizing it as the source of her injuries. This is especially the case, we explained, when a patient is given "assurances that h[er] therapy [i]s proper." *Id.* Moreover, "the client is usually suffering from all or some of the psychological problems that brought him or her into therapy to begin with. As a result, the client is especially vulnerable to the added stress created by the feelings of shame, guilt and anxiety produced . . . ." *Id.* at 1367 (internal quotation marks omitted). Psychiatric injury and its cause, we noted, are "subtler and more complicated" than other injuries. *Id.* at 1367–68 (internal quotation marks omitted).

Greggs asks for leave to amend her complaint to bring her claims within *Simmons*, and we agree she is entitled to that opportunity. *See Carvalho*, 629 F.3d at 892 ("[L]eave to

amend shall be freely given when justice so requires." (citing
Fed. R. Civ. P. 15(a))).  Like Simmons, Gregg may be able to
allege facts making it plausible she neither knew nor
reasonably should have known she was injured by the LTS
program before January 2012.  Individuals undergoing
therapy often expect to feel emotional discomfort as they deal
with the more difficult aspects of their lives.  Pain is often a
byproduct of the healing process, and we should not
encourage, much less require a patient who begins therapeutic
treatment to bring suit at the first sign of emotional
discomfort.  Under this theory, Gregg was unable to
recognize she was injured at all, so this would not be simply
a case where she was unable to recognize the *extent* of her
injury.  *See Wallace*, 549 U.S. at 391.

Like Simmons, Gregg was in treatment, and a government
official told her she was being provided "therapy, counseling,
and mental health treatment."  It may be that Gregg knew or
should have known before January 2012 that her feelings of
emotional discomfort were actually injurious, and that they
were caused by the LTS program.  Her request to transfer out
of KCCC provides at least some support for this conclusion.[3]
But these are questions of fact.  *See Simmons*, 805 F.2d at

---

[3] Still, the allegation is not fatal to her complaint.  At this stage, we
must draw all reasonable inferences in Gregg's favor.  *See TwoRivers*, 174
F.3d at 991. That Gregg was unable to tolerate her feelings of humiliation
does not compel the conclusion she knew she was injured by her mental
health "treatment."  A person may be unable to tolerate pain she otherwise
thinks is part of the healing process.  The same is true of Gregg's
allegation that she "became severely depressed when she was transferred
back to the KCCC modules from the less restrictive LTS housing."
Indeed, this might well suggest Gregg connected her feelings of
depression with her return to a more restrictive housing placement, not
with the LTS program.

1368 ("We stress that what she knew and when she knew it are questions of fact."); *see also id.* ("[W]here the injury and cause thereof are subtler and more complicated . . . it seems particularly inappropriate to determine as a matter of law what the plaintiff should have known." (internal quotation marks omitted)).  We hold only that it may be reasonable for an incarcerated individual who is told she must resurface past sexual traumas to overcome them to rely on these assurances, and to view associated feelings of emotional distress as normal, constructive responses incidental to the healing process.  The district court erred in denying Gregg leave to amend to try to make a plausible showing that it was not until January 2012 that she first became aware of her injuries from her purported treatment in the LTS program.

Costs of appeal are awarded to Appellant Gregg.

**VACATED AND REMANDED.**