James WEISBECK, Plaintiff
and Appellee,

v.

James HESS and Mountain Plains
Counseling Center, Petitioners
and Appellants.

No. 18509.

Supreme Court of South Dakota.

Argued April 25, 1994.

Reassigned June 30, 1994.

Decided Nov. 9, 1994.

Steven C. Beardsley, Mary A. Gubbrud, Lynn, Jackson, Shultz & Lebrun, Rapid City, for plaintiff and appellee.

J. Crisman Palmer, Talbot J. Wieczorek, Gunderson, Palmer, Goodsell & Nelson, Rapid City, for petitioners and appellants.

HENDERSON, Retired Justice (on reassignment).

### PROCEDURAL HISTORY/ISSUES

This is an intermediate appeal which poses a question of first impression for this Court. James Weisbeck (Weisbeck) brought suit against Dr. James Hess (Hess), sole owner of Mountain Plains Counseling Center, alleging professional negligence.

During discovery, Weisbeck requested that Hess produce a list of his patients from the previous seven years. Weisbeck also sought the right to depose Tom Terry, Hess' personal counselor. Hess refused both requests on numerous grounds, including the claim that compliance would violate psychologist-patient privilege.

On October 1, 1993, the trial court issued an Order requiring Hess to turn over his client lists to the court where they would be kept sealed until further order. Permission was also given by the trial court to depose Terry with admissibility of his testimony to be determined at a later date. Hess responded by applying for an intermediate appeal, granted by this Court on October 29, 1993. We address the following issues:

I. Did the trial court abuse its discretion by ordering Hess to divulge his list of patients? We hold that it did.

II. Did the trial court abuse its discretion in allowing Weisbeck to depose Hess' counselor? We hold that it did.

Because the trial court's order would require an improper violation of privileged medical confidentiality, we reverse said order.

## FACTS

During November 1986, Weisbeck's wife of 12 years, Cindy, began counseling sessions with Hess, a licensed psychologist and psychology professor at Black Hills State University (BHSU). Although Weisbeck occasionally received counseling, Hess contends their meetings were only in conjunction with Cindy's counseling. After June 1987, when Cindy began seeing other counselors at Mountain Plains, Hess purportedly never professionally counseled her again. However, that following September, Hess hired her as a part-time secretary.

Weisbeck discovered an envelope containing concert tickets with a poem signed, "Love, Jim," in October 1988. Cindy expressed to her husband that Hess was in love with her. Thereafter, she terminated her employment with Mountain Plains. Five months later, Weisbeck found a love letter from Hess to Cindy wherein Hess expressed a lifelong commitment to her. Hess has since admitted to having sexual relations with Cindy during 1989. All of this having occurred while Cindy and Weisbeck were still married. However, the two divorced in 1990. That same year, Hess, who was also married during these events, divorced his third wife and began consulting with social worker Tom Terry about Hess' involvement with a former patient.

Alleging breach of fiduciary duty, fraud, and seduction, Weisbeck filed a complaint in June 1992 against Hess and Mountain Plains seeking compensatory and punitive damages for Hess' romantic relationship with Cindy, which may have begun while Cindy was under Hess' direct professional care. During discovery, Weisbeck requested a list of Hess' clients from both his private practice and at BHSU over the previous seven years. He also sought to depose Terry about Hess' relationship with Cindy. Hess maintains that he did not begin his relationship with Cindy until 20 months after their counseling sessions ended and refuses to produce the requested information asserting that it is protected privileged information. The trial court granted Weisbeck's motion to compel. Hess appeals.

## DECISION

### I. Hess'.patient list is privileged.

Essentially, this case requires this Court to conceptualize and decide issues on the scope of discovery, doctor-patient privilege, and rights of individuals not party to this litigation.

It is settled law that "[a]ll relevant matters are discoverable unless privileged." *Kaarup v. St. Paul Fire & Marine Ins.*, 436 N.W.2d 17, 20 (S.D.1989). Challengers to a trial court's evidentiary rulings must prove an abuse of discretion. *Stormo v. Strong*, 469 N.W.2d 816, 820 (S.D.1991). *See Aberle v. Ringhausen*, 494 N.W.2d 179, 182–83 (S.D. 1992) (applying an abuse of discretion standard in reviewing orders regarding discovery). By contending that the discovery order violates a confidential privilege, Hess

basically raises a question of statutory interpretation. Construction of a statute is a question of law and is, therefore, fully reviewable without deference to the decision of the trial court. *Reid v. Huron Bd. of Educ.,* 449 N.W.2d 240, 242 (S.D.1989).

■ Pursuant to SDCL 19–13–7, "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition[.]" It is understood, per SDCL 19–13–8, that the patient's psychotherapist at the time of the communication has the authority to claim the privilege but only on behalf of the patient. According to SDCL 19–13–6(4):

> A communication is "confidential" if not intended to be disclosed to third persons, except persons present to further the interest of patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

Hess asserts such communication embodies his list of patients who, in the course of seeking his care, divulge private and personal information. *See* SDCL 36–27A–38 (the confidential relations and communications between a licensed psychologist and a person consulting him in his professional capacity are confidential). Writing for the majority in *Hogue v. Massa,* 80 S.D. 319, 123 N.W.2d 131, 133 (1963), Supreme Court Judge Alex Rentto stated that South Dakota has "a longstanding public policy to encourage uninhibited communication between a physician and his patient." To compel disclosure of a psychotherapy patient's identity, is to directly harm her privacy interests. This harm is exacerbated by the stigma that society often attaches to mental illness. *Scull v. Superior Court,* 206 Cal.App.3d 784, 254 Cal.Rptr. 24, 26 (1988). If a patient knows that the privilege is fraught with exceptions, she is liable to withhold information or avoid therapy altogether. 2 Scott N. Stone & Robert K.

Taylor, TESTIMONIAL PRIVILEGES § 7.02 (2d ed. 1993).

Weisbeck wants the list so he can question Hess' former female patients to bolster his claim that his marriage fell victim to Hess' (alleged) usual ploy of taking advantage of vulnerable female patients. However, this discovery fishing expedition does not provide the facts or rationale necessary to violate the privacy of uninterested parties. Releasing the names of these clients would directly discourage uninhibited communication, due to Weisbeck's *mere* suspicion that such information *may possibly* contain relevant evidence. This plan is not "reasonably calculated to lead to the discovery of admissible evidence." SDCL 15–6–26(b)(1). Nor is it enough to set aside the privilege. 23 AM. JUR.2D, *Depositions & Discovery* § 250 (1983).

Patients will be further damaged when they learn that seeking psychotherapy can unnecessarily become a matter of public record. Albeit the trial court has ordered the list "kept sealed until further order by the Court," it logically remains that such a command does not truly protect. In truth, the list is "sealed" while in Hess' confidential possession. However, the only way the list can serve Weisbeck's discovery interests is by revealing the names. Alas, the privilege has been nullified by the trial court. *Schechet v. Kesten,* 372 Mich. 346, 126 N.W.2d 718, 720 (1964). Simply put, the trial court's ruling defeats the purpose behind the privilege.

Weisbeck's authorities state that the physician-patient privilege is analogous to the psychotherapist-patient privilege. Not necessarily so. As one commentator has noted, "a person in psychotherapy, by and large, visits his psychiatrist with the same secrecy that a man goes to a bawdy house." *Scull,* 254 Cal.Rptr. at 26 (quoting Slovenko, *Psychiatry and a Second Look at the Medical Privilege,* 6 Wayne L.Rev. 175, 188, n. 46 (1960)). "A physical ailment may be treated by a doctor whom the patient does not trust, but if a psychologist or psychiatrist does not have the patient's trust, the therapist cannot treat the patient." *Bond v. District Court,* 682 P.2d 33, 38 (Colo.1984) (citing *Taylor v. Unit-*

*ed States,* 222 F.2d 398, 401 (D.C.Cir.1955)). When an individual makes the courageous choice to seek help, confidentiality begins. This Court should not discourage such courage. The privilege covers that information "which is necessary and proper to enable him to perform his duty or act in his professional capacity[.]" 97 C.J.S. *Witnesses* § 295 (1957). It may extend to include those communications made by a patient which tends to blacken her character. *Id.* Thus, the privilege should cover any form of communication made as a part of the therapeutic relationship. TESTIMONIAL PRIVILEGES at § 7.10. Hence, therapy mandates name confidentiality.

A similar discovery request arose with *In re Zuniga,* 714 F.2d 632 (6th Cir.1983), where two psychotherapists were allegedly involved in a fraudulent billing scheme. During its discourse on the privilege, the court recited Report No. 45, Group for the Advancement of Psychiatry 92 (1960) *quoted in* Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183 at 242:

> Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule ..., there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.

*Zuniga,* 714 F.2d at 638. Although the Sixth Circuit Court of Appeals did not permit use of the privilege under its facts, the court did hold that the scope of the privilege must be considered on a *case-by-case basis. Id.* at 639.

With the "case-by-case basis" in mind, we consider the anonymous patients whose identities are at risk herein. For example, a woman who may have been the victim of sexual abuse as a child may not confront the problem for years but may wish to eventually do so with the utmost privacy. By practical reason, one may assume the potential damage to this woman should one day a stranger come to her door to interrogate her about possible sexual liaisons between her and her mental health counselor. Other less intrusive means, by skillful counsel, may be employed, to learn if Hess is taking advantage of his female patients' vulnerability. Concerning such privacy in this case, the psychotherapist should not be compelled to reveal his patients' names. *Boddy v. Parker,* 45 A.D.2d 1000, 358 N.Y.S.2d 218 (1974); *Scull,* 254 Cal.Rptr. at 28. We hold under the abuse of discretion scope of review, the trial court abused its discretion.

II. *Hess' sessions with Terry qualify as privileged communications.*

■ It is not enough that Weisbeck seeks the *names* of those who have revealed their innermost personal thoughts, he also desires to further violate the privilege by requesting the innermost personal thoughts which Hess divulged to his own counselor, Tom Terry. The trial court complied, issuing the following order, which stated in pertinent part:

> ORDERED, that Plaintiff's Motion to Compel Production of Documents is granted, with the following understandings and stipulations: ...
> 3. That it is the Court's determinations that contacts by Dr. Hess to Tom Terry are discoverable and that Plaintiff's counsel may take the deposition of Tom Terry, pursuant to notice to Robert Van Norman, counsel for Dr. Hess;
> 4. Counsel for the Plaintiff may inquire of Tom Terry regarding the content of the visits between Dr. Hess and Tom Terry, including but not limited to, the discussions regarding Cindy Weisbeck. It is further understood that the Court has not determined whether these discussions are ad-

missible in trial. Such determination shall be made at a later date.

Weisbeck believes that Terry may have counselled Hess about Cindy and that Hess should stop dating her because of professional ethics. Gleaning the record herein, it is apparent that Weisbeck is also hopeful that Terry, via the counseling sessions, has knowledge of other women who Hess allegedly victimized. Regardless of what was revealed during counseling, Weisbeck is, once again, merely fishing. In the same manner that a patient's sessions with a psychotherapist are deemed privileged, this state recognizes the right to privacy between clients and social workers. SDCL 36-26-30(2) provides:

> No licensed certified social worker, social worker, or social work associate or his employee may disclose any information he may have acquired from persons consulting him in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons except:
>
> \*     \*     \*     \*     \*     \*
>
> (2) That a licensed certified social worker, licensed social worker, or licensed social work associate shall not be required to treat as confidential a communication that reveals the contemplation of a crime or a harmful act.

Weisbeck argues that Hess' "romantic" relationship with Cindy, which began during the patient-client sessions according to Weisbeck, was a *harmful* act, and, therefore, Hess' discussions with his social worker regarding this relationship and any other relationships with former patients fall within the 36–26–30(2) exception. There are no South Dakota statutes or cases addressing whether a psychotherapist's sexual involvement with a *former* patient constitutes a harmful, tortious, or even criminal act. (After this tort action had been filed, the South Dakota Legislature, in 1993, enacted a set of statutes criminalizing sexual contact or sexual penetration between a psychotherapist and *current* patients.) For guidance, we turn to the

*Ethical Principles of Psychologists,* published by the American Psychological Association (APA), a scientific and professional society of psychologists. At the time psychologist Hess began his relationship with Cindy, the APA ethical code warned its colleagues against exploiting trust and dependency and against sexual intimacies with clients. However, the ethical code contained no express prohibition on sexual contact between psychologists and *former* patients. Not long after Weisbeck filed his complaint in this matter, the APA amended § 4.07 of its ethical code to read in part:

> Psychologists do not engage in sexual intimacies with a former therapy patient or client for at least two years after cessation or termination of professional services.

American Psychological Association, Inc., *Ethical Principles of Psychologists and Code of Conduct* 9 (1992).

Hess asserts that his *pre*-amendment relationship began 20 months after cessation of his professional services. From her therapy with Hess to her employment with Hess to her intimate relationship with Hess, Cindy maintained continuous contact with Hess. As has been alleged, this certainly created much opportunity for Hess to exploit Cindy's trust and dependency. It also established an appearance of impropriety. Although Hess' actions can certainly be defined as unethical now, neither the APA rules nor our statutes forbade his relationship with Cindy in 1989. Hence, engaging in a sexual relationship with a former patient does constitute a departure from good and accepted psychiatric practice but was not specifically recognized as a *harmful act* by pre–1989 standards set out by Hess' profession or our legislature. Hence, he was in compliance with the only "law" applicable at the time.

Furthermore, SDCL 36–26–30(2) does not require Terry to treat information concerning the contemplation of a harmful act as confidential.\* Neither was Terry required to reveal such information, *assuming Hess even discussed "harmful acts" with him.* Fur-

---

\* This author's writing does not discourage social workers from revealing the truth. Despite the concerns of Chief Justice Miller's writing, this opinion (particularly the corresponding sentence to this footnote) freely permits social workers to report the harmful acts or crimes of their patients.

thermore, we find the scope of the trial court's order overly broad because it called for disclosure of virtually all communications between Hess and his social worker, not just alleged "harmful acts."

Recall, the privilege lies with the client, not the counselor. Its scope is determined by balancing the interests protected by shielding the information sought with those interests advanced by disclosure. *Zuniga,* 714 F.2d at 639–40; *Scull,* 254 Cal.Rptr. at 27. It is not our intention to validate Hess' actions, whatever they may be; rather, this Court seeks to protect the sanctity of the privilege. As such, the trial court's ruling was clearly against reason and evidence and was an abuse of discretion. *Cody v. Edward D. Jones & Co.,* 502 N.W.2d 558, 565 (S.D. 1993).

Reversed.

MILLER, C.J., and SABERS, J., concur in part and concur in result in part.

WUEST and AMUNDSON, JJ., dissent.

KONENKAMP, J., not having been a member of the Court at the time this case was submitted, did not participate.

MILLER, Chief Justice (concurring in part and concurring in result in part).

I concur with Justice Henderson as to Issue I and concur in result as to Issue II.

The crux of Issue II is the proper interpretation of SDCL 36–26–30(2). I depart from Justice Henderson's opinion, because I believe that this statutory provision allows for some narrow discovery regarding communications between Hess and his social worker.

In November 1986, Weisbeck's wife, Cindy, began counseling with Hess. In June 1987, she began treatment with other counselors at Hess's clinic and reportedly did not receive any professional counseling from Hess after June 1987. Hess maintains that he did not begin his relationship with Weisbeck's wife

until March 1989, twenty months after she had ceased being his patient. Hess acknowledges that he had sexual relations with Weisbeck's wife in "late 1989." [1] Weisbeck contends that Hess was seeing his wife at least as early as October 1988, one year and four months after treatment with Hess. Weisbeck's tort action revolves around allegations that Hess breached his duty as a psychologist in forming a sexual relationship with Weisbeck's wife, a former patient.

In response to a motion to compel filed by Weisbeck, the trial court ordered discovery of all communications between Hess and his social worker, Tom Terry. Psychologist Hess appeals the trial court order, claiming that all of his discussions with his social worker fall within the privilege set out in SDCL 36–26–30. This statute provides in relevant part:

> No licensed certified social worker, social worker, or social work associate or his employee may disclose any information he may have acquired from persons consulting him in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons except:
>
> . . . .
>
> (2) That a licensed certified social worker, licensed social worker, or licensed social work associate shall not be required to treat as confidential a communication that reveals the contemplation of a crime or a harmful act[.]

SDCL 36–26–30. Weisbeck counters that Hess's sexual relationship with his former patient, Weisbeck's wife, constituted a "harmful act." He therefore claims that the psychologist's discussions with his social worker regarding this relationship and any other relationships with former patients fall within the SDCL 36–26–30(2) exception to the social worker privilege.

Analysis of the arguments presented by the parties reveals two subissues. The first

---

1. Hess acknowledges that he began seeing Weisbeck's wife in March 1989, and that they engaged in sexual intercourse in "late 1989." Statements in a March 1989 letter from Hess to Weisbeck's wife refer to Weisbeck's wife "snuggling" in Hess's arms and grabbing the hair on his chest to pull him closer. These statements suggest that Hess and Weisbeck's wife had a physical relationship as early as March 1989, even if they did not engage in sexual intercourse until late 1989.

is whether psychologist Hess's relationship with a former patient constitutes a "harmful act" within the meaning of SDCL 36–26–30(2). If it is a harmful act, then the second subissue is the scope of discovery permitted by a statute which allows disclosure of "a communication that reveals the contemplation of a crime or a harmful act."

As noted by Justice Henderson, there are no South Dakota cases or statutes which address whether criminal or civil liability may be imposed on a psychotherapist who engages in sexual relations with a *former* patient. Justice Henderson therefore argues that psychologist Hess's sexual involvement with a former patient is not a harmful act under SDCL 36–26–30(2). However, I believe the better argument is that such contact constitutes a harmful act for purposes of the privilege statute.

Although South Dakota has not spoken to the issue, some states have considered the question of civil liability for sexual contact between mental health care professionals and former patients. Both California and Minnesota have created a cause of action for money damages against psychotherapists who engage in sexual contact with former patients within two years following the termination of therapy. Minn.Stat. § 148A.02 (1992); Cal. Civ.Code § 43.93 (West 1993).

Even in the absence of an express statutory imposition of criminal or civil liability, there is persuasive authority for the proposition that sexual contact between a psychotherapist and a former patient is a harmful act. In *Noto v. St. Vincent's Hospital and Medical Center of New York*, 142 Misc.2d 292, 537 N.Y.S.2d 446 (N.Y.Sup.Ct.1988), *aff'd*, 160 A.D.2d 656, 559 N.Y.S.2d 510 (N.Y.App.Div.1990), *cert. denied*, 76 N.Y.2d 714, 564 N.Y.S.2d 718, 565 N.E.2d 1269 (N.Y. 1990), a New York trial court considered whether sexual relations with a patient after termination of a professional psychiatric relationship could give rise to a medical malpractice action. The plaintiff patient had been under the care of the psychiatrist while receiving inpatient treatment for depression, drug and alcohol dependency and "seductive behavior." *Id.* at 447. The psychiatrist then rotated to another unit. *Id.* After the plain-

tiff patient's discharge, the psychiatrist entered into a personal relationship with the plaintiff in which they drank alcohol, smoked marijuana and had several sexual encounters. *Id.*

The New York trial court noted an absence of any explicit statutory cause of action arising out of sexual contact between a psychiatrist and a former patient. *Id.* at 448. Nevertheless, the court concluded that such behavior was actionable. *Id.* The court rested its decision on the facts of the case and on an expert opinion indicating that "engaging in a sexual relationship with a current or former patient is a departure from good and accepted psychiatric practice." *Id.* at 447–48. In the court's opinion, the cause of action was analogous to a claim for medical malpractice based on the seduction of a patient. *Id.* at 448–49. *See also Stevenson v. Goomar*, 148 A.D.2d 217, 544 N.Y.S.2d 690, 696 (N.Y.App. Div.1989), *cert. denied*, 74 N.Y.2d 945, 550 N.Y.S.2d 278, 549 N.E.2d 480 (N.Y.1989) ("Sexual exploitation of a patient during or even after a course of treatment, the harmful effects of which are by now well recognized and unanimously condemned within the health professions, is a clear violation of the duty of care the physician owes a patient and, thus, constitutes malpractice even if the sexual conduct was not itself done under the guise of treatment.") (citations omitted).

Considerations of professional responsibility are also relevant to a determination of what constitutes a "harmful act." The American Psychological Association (APA), a scientific and professional society of psychologists, publishes *Ethical Principles of Psychologists and Code of Conduct.* At the time psychologist Hess began his relationship with Weisbeck's wife, the *Ethical Principles of Psychologists* stated in relevant part:

Psychologists are continually cognizant of their own needs and of their potentially influential position vis-a-vis persons such as clients, students and subordinates. They avoid· exploiting the trust and dependency of such persons. Psychologists make every effort to avoid dual relationships that could impair their professional judgment or increase the risk of exploitation. Examples of such dual relationships

include, but are not limited to, research with and treatment of employees, students, supervisees, close friends or relatives.· Sexual intimacies with clients are unethical.... Psychologists do not exploit their professional relationships with clients, supervisees, students, employees, or research participants sexually or otherwise. Psychologists do not condone or engage in sexual harassment. Sexual harassment is defined as · deliberate or repeated comments, gestures, or physical contacts of a sexual nature that are unwanted by the recipient.

American Psychological Association, Inc., *Ethical Principles of Psychologists* (1989) (reprinted in Rena A. Gorlin, *Codes of Professional Responsibility* 252–53 (2nd ed. 1990). In December 1992, after Weisbeck had filed his complaint but before issuance of the trial court's discovery order, the APA amended its ethical code to read:

4.07 Sexual Intimacies with Former Therapy Patients (a) Psychologists do not engage in sexual intimacies with a former therapy patient or client for at least two years after cessation or termination of professional services. (b) Because sexual intimacies with a former therapy patient or client are so frequently harmful to the patient or client, and because such intimacies undermine public confidence in the psychology profession and thereby deter the public's use of needed services, psychologists do not engage in sexual intimacies with former therapy patients and clients even after a two-year interval except in the most unusual circumstances. The psychologist who engages in such activity after the two years following cessation or termination of treatment bears the burden of demonstrating that there has been no exploitation, in light of all relevant factors, including (1) the amount of time that has passed since therapy terminated, (2) the nature and duration of the therapy, (3) the circumstances of termination, (4) the patient's or client's personal history, (5) the patient's or client's current mental status, (6) the likelihood of adverse impact on the patient or client and others, and (7) any statements or actions made by the therapist during the course of therapy suggesting or inviting the possibility of a post-termination sexual or romantic relationship with the patient or client.

American Psychological Association, Inc., *Ethical Principles of Psychologists and Code of Conduct* 9 (1992). Importantly, the amended *Ethical Principles* indicate that sexual intimacies with a former therapy patient or client are "frequently harmful to the patient or client." *Id.* The *Ethical Principles* also state that "such intimacies undermine public confidence in the psychology profession and thereby deter the public's use of needed services." *Id.* These statements, set forth by a professional association of psychologists, weigh heavily in favor of a finding that sexual contact with a former patient constitutes a "harmful act" for purposes of limiting the social worker privilege.

Although Justice Henderson stresses that the APA ethical code did not expressly prohibit sexual relationships with former patients at the time Hess formed his relationship with Weisbeck's wife, I believe that the ethical code as it existed put Hess on notice that sexual intimacy between a psychologist and a · patient was improper. The ethical provisions in place at that time instructed psychologists to avoid "dual relationships that could impair their professional judgment or increase the risk of exploitation." American Psychological Association, Inc., *Ethical Principles of Psychologists* (1989) (reprinted in Rena A. Gorlin, Codes of Professional Responsibility 252 (1990)). The ethical code further provided, "Examples of such dual relationships include, *but are not limited to,* research with and treatment of employees, students, supervisees, close friends or relatives." *Id.* (emphasis added). The code added, "Sexual intimacies with clients are unethical." *Id.* Arguably, this last statement applied to all clients, whether or not they were currently receiving treatment.

Furthermore, the fact that the alleged sexual conduct took place before the amendment of the APA code should not affect our determination that such conduct is a harmful act. We turn to the APA ethical code for guidance, not for definitive pronouncements as to what is or is not a harmful act under our social worker privilege statute. The strong

language with which the amended APA ethical code denounces sexual contact between a psychologist and a former patient is persuasive authority for the conclusion that such contact is a harmful act, regardless of whether that contact took place before or after the amendment to the APA code.

I also disagree with Justice Henderson's interpretation of SDCL 36–26–30(2), because it would discourage social workers from coming forward to expose unscrupulous psychotherapists who prey on vulnerable, former patients. At minimum, I believe the exception to the social worker privilege should enable social workers to report to professional associations regarding any psychotherapist who poses a threat of harm to former patients. Justice Henderson concludes that sexual contact between a psychologist and a former patient is not a harmful act and that communications regarding such behavior fall within the protections of the social worker privilege. Under this view, a social worker would violate the privilege statute by reporting a psychotherapist who, during a counseling session, discloses his plans to become sexually involved with former patients; the privilege would attach to these disclosures regardless of how detrimental such intimacy would be to the former patients and to the psychotherapy profession.

Justice Henderson also underscores the South Dakota Code provisions which criminalize sexual contact between psychotherapists and current, but not former, patients. This observation does not decide the issue before us. The exception to the social worker privilege encompasses contemplation of a crime *or* harmful act. The absence of a criminal statute does not resolve whether sexual contact between a psychotherapist and a former patient constitutes a harmful act.

Finally, the notion that sexual contact with former patients is not a harmful act for purposes of the social worker privilege could lead to arbitrary results. Under the South Dakota statutes criminalizing sexual contact between a psychologist and a current patient, a psychologist's communications to a social worker indicating an intent to form a sexual relationship with a current patient would be discoverable. *See* SDCL 36–26–30 and SDCL 22–22–28. In contrast, a psychologist's communications to a social worker would be privileged if they indicated an intent to form the same sexual relationship with a patient a few days after terminating counseling sessions with the patient.

For the reasons discussed above, I conclude that sexual contact between a psychologist and a former patient constitutes a "harmful act" within the meaning of SDCL 36–26–30(2).[2] The next question, then, is the scope of this exception to the social worker privilege. The trial court allowed disclosure of virtually all communications between psychologist Hess and his social worker. I am convinced that this expansive ruling was improper.

The statutory exception at SDCL 36–26–30(2) states:

That a licensed certified social worker, licensed social worker, or licensed social work associate shall not be required to treat as confidential a communication that reveals the contemplation of a crime or a harmful act[.]

There is no South Dakota case law interpreting the proper scope of the exception contained in SDCL 36–26–30(2). Likewise, helpful cases from other jurisdictions are disappointingly sparse, largely due to the individualized nature of privilege statutes in other states. However, there is persuasive authority that indicates the exception to the privilege encompasses only communications regarding future crimes or future harmful acts. New York has a statutory exception to the social worker privilege which is essentially identical to the South Dakota version. This exception provides: "[T]hat a certified social worker shall not be required to treat as confidential a communication by a client which reveals the contemplation of a crime or harmful act." N.Y.Civ.Prac.L. & R. § 4508(a)(2) (McKinney 1992). According to the practice commentary following this statute, this exception means that "no privilege

---

**2.** This opinion only decides the issue of whether sexual contact between a psychologist and a former patient constitutes a "harmful act" under SDCL 36–26–30(2). It does not determine whether Hess engaged in any tortious conduct to which civil liability would attach.

applies to the client's revelation of a *future crime or harmful act.*" N.Y.Civ.Prac.L. & R. § 4508(a)(2) commentary at 15 (McKinney 1992) (emphasis added). This limitation on the privilege "parallels the judge-made exception to the attorney-client privilege." *Id.*

A similarly narrow, intent-driven interpretation was endorsed in *People v. Bass,* 140 Misc.2d 57, 529 N.Y.S.2d 961 (N.Y.Sup.Ct. 1988). In *Bass,* the New York Supreme Court noted an absence of any statements to the social worker indicating that defendant would, or feared he would, continue sexual activity with his daughter. *Id.* 529 N.Y.S.2d at 963. The court therefore held that defendant's statements to the social worker, limited as they were to admissions that he had engaged in sexual activity with his daughter in the past, did not fall within the statutory exception for communications revealing the *contemplation* of a crime or harmful act. *Id.* 529 N.Y.S.2d at 963 (disagreed with on other grounds, *People v. Gearhart,* 148 Misc.2d 249, 560 N.Y.S.2d 247 (N.Y.Crim.Ct.1990) (statutory requirement that physicians report child abuse suspends application of the physician-patient privilege in all judicial proceedings involving child abuse or neglect)).

In support of the broad discovery ordered by the trial court, Justice Wuest cites several earlier New York cases. However, these cases are clearly distinguishable from the case before this Court. In *Perry v. Fiumano,* 61 A.D.2d 512, 403 N.Y.S.2d 382, 384 (N.Y.App.Div.1978), a divorced mother sought custody of her child, alleging that the custodial father was emotionally unstable. Mother sought disclosure of father's psychological records held by a counseling center and a certified social worker at the center. *Id.* Father alleged that the records were privileged. *Id.* The court noted the doctrine of *parens patriae* and the judicial trend to carve out a limitation on privilege in cases involving the welfare and best interests of children. *Id.* 403 N.Y.S.2d at 385. Consequently, in interpreting the "harmful act" exception to the social worker privilege, the court reasoned that "statements made or information given by the [father] to the social worker bearing adversely upon the health, safety and welfare of the infant are not privi-

leged within the contemplation of the statute and are subject to compulsory disclosure." *Id.* 403 N.Y.S.2d at 386 (citing *Community Service Society v. Welfare Inspector General of State of New York,* 91 Misc.2d 383, 398 N.Y.S.2d 92 (N.Y.Sup.Ct.1977); *People v. Brooks,* 50 A.D.2d 319, 376 N.Y.S.2d 928, 929 (N.Y.App.Div.1975), *reversed on other grounds,* 42 N.Y.2d 866, 397 N.Y.S.2d 792, 366 N.E.2d 879 (N.Y.1977)).

The court's rationale for taking a more expansive view of the "harmful act" exception is inapplicable to this case. Neither the doctrine of *parens patriae* nor the court's traditional focus on the best interests of the child can be invoked to justify broad discovery in a case revolving around a psychologist's relationship with an adult patient.

Although Justice Wuest cites another New York case for the proposition that "statements made to a social worker indicating possible fraud were not privileged," this summary misconstrues the holding of the case. In *New York v. O'Gorman,* 91 Misc.2d 539, 398 N.Y.S.2d 336, 338 (N.Y.Sup.Ct.1977), defendants misrepresented their ownership interest in real property in order to receive welfare payments. These misrepresentations were made to certified social workers administering the welfare program. *Id.* 398 N.Y.S.2d at 337–38. After being charged with grand larceny and deliberate concealment, defendants argued that these fraudulent misrepresentations were privileged under N.Y.Civ.Prac.L. & R. § 4508, the statute establishing a privilege for communications to certified social workers. *O'Gorman,* 398 N.Y.S.2d at 338. The court rejected defendants' interpretation, citing the general rule that a "personal confidence can never be used to cover a transaction which is in itself a crime." *Id.* 398 N.Y.S.2d at 338 (quoting *New York v. Farmer,* 194 N.Y. 251, 87 N.E. 457, 464 (N.Y.1909)).

The holding in *O'Gorman* is irrelevant to the disposition of this case. There is no indication that Hess's statements to his social worker constituted a crime or an element of a crime. Consequently, the existence or nonexistence of a privilege between Hess and his social worker is unaffected by *O'Gorman.*

South Dakota could adopt a broader interpretation of its statute than the New York authorities have favored. Arguably, the phrase "contemplation of a crime or a harmful act" could extend beyond merely future plans or intentions. For example, one entry in Webster's Third New International Dictionary, Unabridged 491 (16th ed. 1971) defines contemplation as "an act of the mind in considering with attention: continued attention to a particular subject: MEDITATION, MUSING, STUDY." This definition supports a broad interpretation of SDCL 36–26–30(2) and would allow discovery of virtually any statement to a social worker concerning a crime or harmful act. In contrast, another entry in the same dictionary defines "contemplation" as "the act of looking forward to an event: the act of intending or considering a future event: EXPECTATION." Webster's Third New International Dictionary, Unabridged 491 (16th ed. 1971). This definition coincides with the view that only statements intimating a future intent are admissible under SDCL 36–26–30(2).

In spite of two plausible interpretations, I suggest that the better view is the narrower, intent-driven interpretation. First, as noted in Justice Henderson's opinion, society's interests in protecting a patient's privacy and encouraging uninhibited communication with psychotherapists are compelling. A far-reaching exception to the social worker privilege would severely threaten these interests. Second, if the legislature had intended a broad exception to the social worker privilege, it could have used unambiguous language showing that intent. For example, the Idaho Rules of Evidence carve out an exception to the social worker privilege for communications that reveal "the contemplation *or execution* of a crime or harmful act." Idaho R.Evid. § 518 (1994) (emphasis added). Similarly, a former Massachusetts statute allowed discovery of communications that reveal "the contemplation *or commission* of a

crime or a harmful act." *Massachusetts v. Collett*, 387 Mass. 424, 439 N.E.2d 1223, 1225 n. 1 (1982) (citing Mass.Gen.Laws ch. 112, § 135(b) (revised 1989)) (emphasis added).[3]

Because the South Dakota Legislature did not employ such broad language in enacting SDCL 36–26–30(2), the extensive discovery allowed by the trial court, extending to essentially all exchanges between Hess and his social worker, was improper. The trial court should have limited discovery to communications by Hess to his social worker indicating a future intent to initiate or continue sexual relationships with his former or current patients. In this regard, I disagree with both the "all" approach of Justice Wuest and the "nothing" approach of Justice Henderson.

Finally, the dissent raises a procedural issue which should be addressed. The dissent endorses the trial court's decision to allow broad discovery and then determine at a later date whether the privilege renders some or all of the evidence inadmissible. According to the dissent, the trial court could then enter a protective order sealing the records from unnecessary public disclosure. I assert that this "postponement" approach undermines the privilege to the point of destroying it. Disclosing information to the parties, which is later determined to be privileged, frustrates the purpose of the privilege statute. In future cases, where the judge is uncertain whether any communications fall within the exception at SDCL 36–26–30(2), an "in camera hearing is the proper procedure to allow the judge to determine whether or not the privilege applies to communications made to the social worker." *Collett*, 439 N.E.2d at 1230, *aff'd*, 17 Mass.App.Ct. 913, 455 N.E.2d 1006 (1983), *cert. denied*, 390 Mass. 1106, 459 N.E.2d 824 (1984). "The judge should phrase his questions to the social worker so as to limit the social worker's disclosures to information likely to fall within the exception." *Id.* at 1232. Third

---

**3.** Justice Wuest's dissent cites two Massachusetts cases, *Massachusetts v. Berrio*, 407 Mass. 37, 551 N.E.2d 496, 499 (1990) and *Massachusetts v. Collett*, 387 Mass. 424, 439 N.E.2d 1223, 1228 (1982), in support of the trial court's broad discovery order. Both of these cases deal with the interpretation of the pre–1989 Massachusetts statute, which allowed discovery of communica-

tions that reveal "contemplation *or commission* of a crime or harmful act." Mass.Gen.Laws ch. 112, § 135(b). Because of the different and broader language in the Massachusetts statute, the precedential value of these cases in interpreting the narrower South Dakota statute is questionable.

persons, such as the parties and their attorneys, "should not be present during this determination because there is a strong likelihood that some of the disclosed information will not come within an exception and will remain privileged." *Id.* at 1231–32.

SABERS, Justice (concurring in part and concurring in result in part).

I concur in Issue 1. I join Chief Justice Miller's concurrence in result in part on Issue 2.

WUEST, Justice (dissenting).

As noted by the majority, challengers to a ruling on an evidentiary matter must prove that the trial court abused its discretion. Because a judicial mind, in view of the law and the circumstances of this case could reasonably have concluded as did the trial court in this case, I dissent. Additionally, the majority would allow a psychotherapist to discuss his harmful acts against a client with a social worker, and allow those discussions to remain privileged. Therefore, I dissent on that issue also.

### FACTS

Plaintiff Weisbeck was married to his wife Cindy in 1974. Starting in November 1986, Cindy started counseling sessions with Hess.[1] Weisbeck was also counseled by Hess, although not as frequently as Cindy. The record shows that after June 1987, Cindy continued as a patient of MPCC, but the only counseling sessions for which she was billed were with counselors other than Hess. In September 1987, Hess employed Cindy to do secretarial work for MPCC. Both Weisbeck and Cindy were patients of MPCC until April 1988. In October 1988, Weisbeck discovered the concert tickets and a poem signed, "Love, Jim." Confronted with these items, Cindy thereupon admitted to her husband (Weisbeck) that Hess had told her he loved her. Cindy terminated her employment with

MPCC in October 1988. In March 1989, Weisbeck discovered the lengthy letter from Hess to Cindy, wherein Hess expressed his love for and lifelong commitment to Cindy, stating in part:

> I will be by your side and we will get through all of this. I believe with all my heart that we can have a happy life together. . . . You have so many times said that you have so little to give me and I would have to give so much. All I need from you is for you to love me and show me that you love me and willing to be my partner. There are so many ways you show me even now. Your calls, your coming to school this week, cookies on my car, when you snuggle in my arms . . . even when you grab the hair on my chest to pull me closer to you. . . . I look forward to a lifetime of teaching and learning from each other and sharing all kinds of experiences. . . . With each other, the best years of our lives are still ahead of us.

As noted by the majority, both Hess and Cindy were married at the time this letter was written, and Hess also admits that he had sexual intercourse with Cindy in 1989, while she was still married to Weisbeck. Cindy was divorced from Weisbeck in 1990; Hess was also divorced (from his third wife) in 1990. Sometime in 1990, Hess began to consult with Tom Terry (Terry), a social worker (not licensed at the time Hess consulted with him), regarding the fact that Hess was involved with a former patient. Hess had approximately eight to ten sessions with Terry.

During the course of discovery in the present action, Weisbeck made two requests for information from Hess: (1) Weisbeck requested client lists, including clients in Hess' private practice, as well as clients who were students at BHSU; and (2) Weisbeck sought to depose Terry, the social worker with whom Hess met regarding his relationship

---

1. Attached to Hess' deposition are MPCC billing records for counseling sessions for Weisbeck and Cindy. These records show that Weisbeck was present for at least 10 counseling sessions, either alone or with Cindy. Hess maintains that Weisbeck was not a patient of the clinic; that only Cindy was a patient, and that Weisbeck was only seen in conjunction with Cindy's counseling. Clearly, Hess' contention that Weisbeck was not a patient of Hess or MPCC is flawed. Weisbeck was billed for all sessions, and by Hess' own admission, Weisbeck was never told that he was not a patient.

with Cindy. After briefs and a hearing, the court entered an order granting Weisbeck's motion to compel, with certain stipulations. First, the client lists would be turned over to the court and kept under seal. Second, at the Terry deposition, counsel for Weisbeck could make inquiry "regarding the content of the visits between [Hess and Terry], including but not limited to, the discussions regarding [Cindy]." The court concluded its order stating, "It is further understood that the Court has not determined whether these discussions are admissible in trial. Such determination shall be made at a later date."[2] It was from this order that Hess took an intermediate appeal.

### STANDARD OF REVIEW

In regard to the scope of discovery, this court has stated:

> The scope of pretrial discovery is, for the most part, broadly construed. *Bean v. Best,* 76 S.D. 462, 80 N.W.2d 565 (1957). SDCL 15–6–26(b) provides, "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." A broad construction of the discovery rules is necessary to satisfy the three distinct purposes of discovery: (1) narrow the issues; (2) obtain evidence for use at trial; (3) secure information that may lead to admissible evidence at trial.

*Kaarup v. St. Paul Fire and Marine Ins. Co.,* 436 N.W.2d 17, 19 (S.D.1989) (citing 8 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2001 (1970)). This court has noted that the scope of discovery has "'ultimate and necessary boundaries.'" *Kaarup,* 436 N.W.2d at 20 (quoting *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451, 460 (1947)). However, the United States Supreme Court has stated that, "[e]videntiary privileges in litigation are not favored[.]"

*Herbert v. Lando,* 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115, 133 (1979). "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1065 (1974). Further, this court has noted that, "It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence." *Williams v. Carr,* 84 S.D. 102, 104, 167 N.W.2d 774, 775 (1969) (noting the similarities between South Dakota and Federal Rules of Civil Procedure, and quoting the forerunner to our present rule SDCL 15–6–26(b)).

Evidentiary rulings of the court are reviewed under an abuse of discretion standard. *Zens v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.,* 479 N.W.2d 155, 159 (S.D.1991) (citations omitted). *See State v. Christopherson,* 482 N.W.2d 298, 300 (S.D. 1992). Similarly, we have held that under the rules of criminal procedure, "the extent of discovery permitted by either side rests in the discretion of the court." *State v. Catch The Bear,* 352 N.W.2d 640, 644 (S.D.1984) (citations omitted). As noted by the majority, a trial court's orders regarding discovery are reviewed by applying the abuse of discretion standard. *See Aberle v. Ringhausen,* 494 N.W.2d 179, 182–83 (S.D.1992) (applying an abuse of discretion standard to review of trial court's orders regarding discovery); *William Ins. of Pierre v. Bear Butte Farms Ptrshp.,* 392 N.W.2d 831, 833 (S.D.1986) (holding that it was "within the trial court's discretion to refuse any additional discovery" and that the court's refusal to allow additional discovery was not an abuse of discretion). *See also Doe v. Puget Sound Blood Center,* 117 Wash.2d 772, 819 P.2d 370, 373 (1991) (reviewing a discovery order, and noting that,

---

**2.** At the hearing on the motion to compel, the court stated:

> We don't know yet if the privilege applies here with Terry's status. We don't know yet the nature and purpose of all this, and the only way you will find out is through discovery. This may be a privileged communication. It may turn out to be that way, and it will stay

privileged. It will be sealed.... If there is no privilege there, then it is down to a matter of deciding what portions of it become admissible, relevant, all those sorts of things. That is all I am trying to structure here.... I don't have enough stuff to know if privilege applies or not[.]

"it is the proper function of the trial court to exercise its discretion in the control of litigation before it."); *Terre Haute Regional Hosp. v. Trueblood*, 600 N.E.2d 1358, 1362 (Ind.1992) (stating that "the standard of review in discovery matters is limited to determining whether the trial court abused its discretion.") (citations omitted). This court has long held that the test utilized in review of matters "involving judicial discretion is *whether we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion.'*" *Myron v. Coil*, 82 S.D. 180, 185, 143 N.W.2d 738, 740 (1966) (emphasis added) (quoting *F.M. Slagle & Co. v. Bushnell*, 70 S.D. 250, 254, 16 N.W.2d 914, 916 (1944)). *See In re Guardianship of Jacobsen*, 482 N.W.2d 634, 636 (S.D.1992); *Christopherson*, 482 N.W.2d at 300.

## ISSUE I: DID THE LOWER COURT ABUSE ITS DISCRETION IN ORDERING HESS TO PRODUCE HIS CLIENT LISTS?

In response to Weisbeck's request seeking Hess' client lists, Hess claims that the production of these lists is barred by a statutory psychotherapist-patient privilege. Hess initially cites SDCL 19–13–7, which provides:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.[3]

Hess claims this statutory privilege based on SDCL 19–13–8, which provides in pertinent part: "The person who was the physician or psychotherapist at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient."

We have previously recognized the existence of a statutory patient-psychotherapist privilege. *In re M.C.*, 391 N.W.2d 674, 675–76 (S.D.1986) (citing SDCL 19–3–7). Generally, the physician-patient privilege is without a common law basis; rather, it "is created and controlled by statute or court rule." *Wheeldon v. Madison*, 374 N.W.2d 367, 376 (S.D.1985) (citing 2 WEINSTEIN'S EVIDENCE § 504[01] at 504–8 (1982)). In *Wheeldon*, this court noted the rules found in SDCL ch. 19–13 on which Hess relies in this case. The majority opinion fails to cite *Wheeldon*, wherein we stated: *"The intent of this rule is clear. Only 'confidential communications' between a physician and his patient are protected under the statute."* 374 N.W.2d at 376 (emphasis added) (citing SDCL 19–13–7; SDCL 19–13–6(4); holding that where a physician was not asked for any information related to treatment of the patient, the testimony was not privileged).

Here, the client lists requested by Weisbeck are not related to treatment of any of the clients. The client names are not "confidential communications" under the rules contained in SDCL ch. 19–13; thus, the information is *not privileged and may be discovered.* This rule is in accordance with our holding that, "[t]he facts concerning the existence of a lawyer-client relationship are not privileged evidence." *Catch The Bear*, 352 N.W.2d at 645 (citing MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE 185 (2d ed. 1972)). *See Rosegay v. Canter*, 187 N.J.Super. 652, 455 A.2d 610, 611–12 (1982) (stating that, "[t]here

---

**3.** A related statute defines a number of the terms found in SDCL 19–13–7. SDCL 19–13–6 provides:

> As used in this §§ 19–13–6 to 19–13–11, inclusive:
> (1) A "patient" is a person who consults or is examined or interviewed by a physician or psychotherapist. . . . (3) A "psychotherapist" is . . . (b) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged. (4) A commu-

nication is "confidential" if not intended to be disclosed to third persons, except persons present to further the interest of patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

is no rational basis to conclude that the patient-psychologist privilege would be superior [to the attorney-client privilege].").

Other courts that have directly faced the question of discovery of patient identities would support this rationale. This is borne out in secondary authorities, as well as case law from other jurisdictions. It has been stated that, "A physician is free to testify as to the fact of his employment or being consulted by, attendance on, and treatment of, a certain patient, the fact that the patient was ill, the place and duration of the treatment, the number and dates of his visits, and similar facts." 97 C.J.S. *Witnesses* § 295 (1957). Another authority on privileges notes:

A doctor's conclusions, diagnoses, and treatments are usually covered by the privilege, even though they may not themselves reveal patient communications. The rationale for this result is that patients may avoid therapy or treatment if not guaranteed confidentiality. *The privilege does not, however, shield from disclosure the fact that the patient received treatment and the dates of such treatment.*

2 SCOTT N. STONE & ROBERT K. TAYLOR, TESTIMONIAL PRIVILEGES § 7.13 (2d ed. 1993) (emphasis added). *See Gechoff v. Our Lady of Victory Hosp.,* 190 A.D.2d 1060, 593 N.Y.S.2d 682, 683 (N.Y.App.Div.1993) (concluding "that the disclosure of the identity of [a] nonparty witness does not violate the doctor-patient privilege" provided by statute); *House v. SwedishAmerican Hosp.,* 206 Ill.App.3d 437, 151 Ill.Dec. 467, 564 N.E.2d 922, 927 (1990) ("Simply revealing [a] patient's identity, in and of itself, will not result in the disclosure of confidential communications. It is evident that disclosure of the patient's name does not violate the physician-patient privilege."); *Jenkins v. Metropolitan Life Ins. Co.,* 171 Ohio St. 557, 173 N.E.2d 122, 125 (1961) (holding that the patient-physician privilege does not prevent testimony by a physician as to the fact that he was consulted by a patient on a certain date); *Wolf v. Colorado,* 117 Colo. 279, 187 P.2d 926, 927 (Colo.1947) (holding that in a prosecution against a physician for conspiracy to commit abortion, records showing the names, addresses and telephone numbers of patients did not fall within the patient-physician privilege); *Entian v. Provident Mut. Life Ins. Co. of Philadelphia,* 155 Misc. 227, 279 N.Y.S. 580, 582 (N.Y.Cty.Ct.1935) (holding that testimony of a physician that a certain individual consulted with him was not privileged).

Similarly, the Sixth Circuit Court of Appeals has considered the nature and scope of a psychotherapist-patient privilege. *In re Zuniga,* 714 F.2d 632 (6th Cir.1983). Although cited by the majority, this case supports the rule that disclosure of the patient's identity does not violate confidentiality. The court stated that, "the appropriate scope of a privilege, like the propriety of the privilege itself, is determined by balancing the interests protected by shielding the evidence sought with those [interests] advanced by disclosure." 714 F.2d at 639–40. After balancing these interests, the court concluded:

The essential element of the psychotherapist-patient privilege is its assurance to the patient that his innermost thoughts may be revealed without fear of disclosure. *Mere disclosure of the patient's identity does not negate this element.* Thus, the Court concludes that, as a general rule, the identity of a patient or the fact and time of his treatment does not fall within the scope of the psychotherapist-patient privilege.

*Id.* at 640 (emphasis added).

Hess places additional reliance for a privilege based on SDCL 36–27A–38, which provides:

The confidential relations and communications between a licensed psychologist and a person consulting him in his professional capacity are confidential. Nothing in this chapter may be construed as to require those privileged communications to be disclosed; nor may a psychologist's secretary, stenographer or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.

Hess argues that the phrase, "confidential relations and communications" provides a heightened privilege for psychologists, placing particular emphasis on the word "relations." Hess urges that under South Dakota law, the very existence of a relationship be-

tween a psychologist and patient is protected by privilege. Such reasoning is flawed.

A number of other state statutes dealing with a psychotherapist-patient privilege contain the phrase, "confidential relations and communications."[4] No case is located indicating that courts of those states place any different or significant distinction on the word "relations" as opposed to "communications." For example, the Georgia Court of Appeals made no distinction between "relations" and "communications" in its discussion of the state statute on the patient-psychotherapist privilege. *Annandale at Suwanee, Inc. v. Weatherly,* 194 Ga.App. 803, 392 S.E.2d 27, 28 (1990). That court allowed discovery of those parts of a psychotherapist's records which were not deemed to be "communications." *Id.* That same court had also specifically addressed the issue of discovery of patient identities. *National Stop Smoking Clinic—Atlanta, Inc. v. Dean,* 190 Ga.App. 289, 378 S.E.2d 901 (Ga.App.1989). In this medical malpractice and fraud action, the plaintiffs sought discovery of the names and addresses of all persons who had received treatment at the clinic. 378 S.E.2d at 901. The lower court entered an order compelling the defendant clinic to produce this information, and the clinic brought an interlocutory appeal. *Id.* The court of appeals stated that, "even in circumstances where communications *are* privileged, such as within the psychiatrist-patient relationship ... evidence showing the *fact* of employment of or treatment by a psychiatrist is not privileged." *Id.* at 902 (citing *Cranford v. Cranford,* 120 Ga.App. 470, 170 S.E.2d 844, 846 (1969); GA.CODE ANN. § 24-9-21(5)).[5] The court concluded, "that the privilege accorded psychiatrists and psychologists ... does not extend to their patients' identities." *Id.*

Similarly the New Hampshire Supreme Court has held that under its patient-psychotherapist privilege statute, "only confidential relations and communications between a patient and a [psychiatrist or psychotherapist] which are customary and necessary for diagnosis and treatment, are privileged. Thus, observations ... when not made for the purpose of diagnosis and treatment, are not privileged." *In re Kathleen M.,* 126 N.H. 379, 493 A.2d 472, 477 (1985).

Several cases relied upon by Hess are distinguishable from the case at bar. In a Texas case, two women sued a male psychologist who had sexual intercourse with them during psychotherapy sessions at the office. *Ex parte Abell,* 613 S.W.2d 255, 256 (Tex. 1981). One of the plaintiffs' interrogatories to Abell requested the identities of any current or former patients that the psychologist has "kissed, touched, hugged, fondled or had any sexual contact of any type, including sexual intercourse[.]" 613 S.W.2d at 256. The trial court ordered that the information be supplied in a sealed envelope to the court *and* to the plaintiffs' attorneys. *Id.* at 257. Abell refused to comply and was held in contempt. *Id.* While the psychologist's appeal was pending, the Texas Legislature passed a statute providing for the confidentiality of a patient's *"identity,* diagnosis, evaluation or treatment." *Id.* at 258 n. 3 (quoting TEX.REV.CIV.STAT.ANN. art. 5561h § 2(b) (1979) (emphasis added)). The Texas Supreme Court held that the statute could be applied retroactively, and "that the statute forbids disclosure of the identity of former patients/clients of Abell." *Id.* at 262–63. Because South Dakota has no similar statute specifically prohibiting disclosure of a patient's *identity* as well as communications, the *Abell* case fails to support Hess' position.

---

**4.** ALA CODE § 34-26-2 (1991); ARIZ.REV.STAT.ANN § 32-2085 (1992); ARK.CODE ANN. § 17-96-105 (Michie 1992); CAL.BUS. & PROF.CODE § 2918 (West 1990); GA.CODE ANN § 43-39-16 (1990); IDAHO CODE § 54-2314 (1988); KAN STAT.ANN § 74-5323 (1992); MONT.CODE ANN. § 26-1-807 (1993); N.H.REV.STAT.ANN. § 330-A:19 (Supp.1993); N.J.REV STAT.ANN. § 45-14B-28 (West Supp. 1993); N.Y.CIV PRAC.L. & R. § 4507 (West 1992); 42 PA.CONS.STAT.ANN § 5944 (West Supp.1993); TENN CODE ANN. § 63-11-213 (1990).

**5.** GA CODE ANN. § 24-9-21(5) provides: "There are certain admissions and communications excluded on grounds of public policy. Among these are: (5) Communications between psychiatrist and patient." An additional statute in effect at the time *National Stop Smoking* was decided, although not cited in the opinion, was GA.CODE ANN. § 43-39-16, which provides in pertinent part: "The confidential relations and communications between a licensed psychologist and client are placed upon the same basis as those provided by law between attorney and client[.]"

Hess relies on two cases from California in support of his position. The first is *Smith v. Superior Court*, 118 Cal.App.3d 136, 173 Cal. Rptr. 145 (1981). In *Smith*, the psychologist was the husband in a divorce action. 173 Cal.Rptr. at 146. The wife sought discovery of the husband/psychologist's client lists for the purpose of determining the husband's income over a seventeen-month period. *Id.* In refusing to order disclosure of the psychologist's client lists, the court specifically pointed out other means available to discover the husband's income—such as examining the "receptionist or professional associates regarding the number of patients [husband] ordinarily counsels and his customary fees and gross receipts ... [and showing] inconsistencies between [husband's] representations regarding his income and past living expenses." *Id.* at 148. Thus, the facts of *Smith* are not in any way analogous to those presented here.

In a later California case relied upon by Hess, the court noted that, "[i]t is well-settled in California that the mere disclosure of the patient's identity violates the psychotherapist-patient privilege." *Scull v. Superior Court*, 206 Cal.App.3d 784, 254 Cal.Rptr. 24, 26 (1988) (citations omitted). In support of this rule, the court noted the independent "inalienable right to privacy" provided in the state constitution. 254 Cal.Rptr. at 27 (citing CALIF. CONST. art. I § 1). We note that the South Dakota constitution contains no similar provision. The *Scull* court went on to state:

> However, the patient-psychotherapist privilege is not absolute. The state has a significant interest in facilitating '... the ascertainment of truth and the just resolution of legal claims.' Indeed, '[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.'
>
> When the right to disclosure clashes with a privilege, the court is required to 'indulge in a careful balancing' of the need for disclosure against the fundamental right of privacy. The scope of the privilege is determined by balancing the interests protected by shielding the evidence sought with those advanced by disclosure.

> When the balance swings in favor of disclosure, the court is required to limit the scope of discovery 'to the extent necessary for a fair resolution of the lawsuit.'

*Scull*, 254 Cal.Rptr. at 27 (citations omitted). Under the facts of *Scull*, the court decided that the patient identities need not be disclosed, noting particularly that the seventy-one-year-old retired psychologist who had been charged with four criminal counts of sexual molestation of a teenaged patient was no longer a threat to the public. *Id.* at 25–27. Although the majority cites *Scull* in support of its position, the materially different facts of the case at bar readily reveal that the *Scull* case is insufficient authority.

A review of the law indicates that the trial court did not abuse its discretion in ordering the patient lists to be produced to the court. This court should not now rule that a judicial mind, in view of the law and the circumstances of this case, could not have reached this conclusion. *Myron*, 82 S.D. at 185, 143 N.W.2d at 740 (citations omitted). As noted in its order, the trial court could make and carefully enforce provisions to protect the privacy of nonparty patients. *See Blue Cross and Blue Shield of Minnesota v. Larson*, 472 N.W.2d 885, 886 (Minn.App.1991) (noting that the trial court drafted a protective order restricting access to patient identity information).

*ISSUE II:* **DID THE TRIAL COURT ABUSE ITS DISCRETION IN ORDERING THAT SOCIAL WORKER TERRY BE DEPOSED?**

During his deposition, Hess was asked whether he had ever consulted with anyone regarding whether it was proper behavior to date a woman that was a former patient. Hess responded that he had consulted with Terry, a social worker, on eight to ten occasions. Weisbeck sought to depose Terry, specifically to discover statements made to Terry about the ethics and propriety of dating patients and former patients. Hess claims that all content of his visits with Terry are privileged, citing SDCL 36–26–30 which provides in pertinent part:

> No licensed certified social worker, social worker, or social work associate or his

employee may disclose any information he may have acquired from persons consulting him in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons except: ... (2) That a licensed certified social worker, licensed social worker, or licensed social work associate shall not be required to treat as confidential a communication that reveals the contemplation of a crime or a *harmful act* [.]

(Emphasis added). Weisbeck urges that the content of Hess' visits with Terry are not privileged, because those communications would reveal Hess' contemplation of a "harmful act"—specifically, Hess' romantic involvement with Cindy, a former patient.[6] Hess argues that no harmful act ever took place.[7] Specifically, Hess states that, "no evidence exists that [Hess] is now dating patients or has in the past. [Hess] has testified he has never dated a patient. Further, the only former patient he has ever dated is [Cindy] and this relationship did not start until 20 months after his counseling of her terminated."

The majority fails to note that Hess' contentions regarding his relationships with Cindy and other patients conflict with other evidence in the record. Both Cindy and Weisbeck were patients of MPCC until April 1988. Although Cindy had not been billed for counseling sessions with Hess since June 1987, Hess continued to receive forty percent of all gross revenues from both Cindy and Weisbeck's counseling sessions, as sole owner of MPCC. Weisbeck observed signs of romantic involvement between Cindy and Hess during 1988, and found the concert tickets and poem in October 1988. The March 1989 letter from Hess also indicates prior romantic involvement, and indicates Hess' desire at that point to make a lifelong commitment to

---

**6.** Weisbeck submits documentation to support his contention that a therapist's dating a current or former patient is a harmful act, specifically noting a psychologist's mishandling of what is known as the "transference phenomenon." *See, e.g., Simmons v. United States*, 805 F.2d 1363, 1364–66 (9th Cir.1986). The Ninth Circuit noted that, "Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is 'generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past.'" *Simmons*, 805 F.2d at 1364 (quoting STEDMAN's MEDICAL DICTIONARY 1473 (5th Lawyers' Ed.1982)). "When the therapist mishandles transference and becomes sexually involved with a patient, medical authorities are nearly unanimous in considering such conduct to be malpractice." 805 F.2d at 1365 (citations omitted). The court of appeals noted with approval the findings of the district court in *Simmons*:

The impacts of sexual involvement with one's counselor are more severe than the impacts of merely 'having an affair' for two major reasons: first, because the client's attraction is based on transference, the sexual contact is ordinarily akin to engaging in sexual activity with a parent, and carries with it the feelings of shame, guilt and anxiety experienced by incest victims. Second, the client is usually suffering from all or some of the psychological problems that brought him or her into therapy to begin with. As a result, the client is especially vulnerable to the added stress created by the feelings of shame, guilt and anxiety produced by the incestuous nature of the relationship, and by the sense of betrayal that is felt when the client eventually learns that she is

not 'special' as she had been led to believe, and that her trust has been violated.
*Id.* at 1367.

**7.** The 1993 legislature passed a statute that, although clearly not imposing retroactive criminal liability, does speak to the public policy of this state regarding whether such acts are "harmful acts." SDCL 22–22–28 provides:

A psychotherapist who knowingly engages in sexual contact, as defined in § 22–22–7.1, with a person who is not his spouse and who is his emotionally dependent patient at the time of contact, commits a Class 5 felony. Consent by the patient is not a defense.
SDCL 22–22–29 provides:
A psychotherapist who knowingly engages in an act of sexual penetration, as defined in § 22–22–2, with a person who is not his spouse and who is his emotionally dependent patient at the time that the act of sexual penetration is committed, commits a Class 4 felony. Consent by the patient is not a defense.
SDCL 22–22–27 provides in pertinent part:
Terms used in §§ 22–22–28 and 22–22–29 mean: ... (3) "Patient," a person who seeks or obtains psychotherapeutic services from a psychotherapist on a regular and ongoing basis; and (4) "Emotionally dependent," a condition of the patient brought about by the nature of the patient's own emotional condition or the nature of the treatment provided by the psychotherapist which is characterized by significant impairment of the patient's ability to withhold consent to sexual acts or contact with the psychotherapist and which the psychotherapist knows or has reason to know exists.

Cindy. The text of the March 1989 letter indicates that at the same time he was romantically involved with Cindy, *Hess still related to her in a counseling role:*

> If you take charge of your life now and do what you need to do to find happiness, then you will have so much more to offer the kids, yourself and all those around you.... You have a chance now to start a new life and put the hurt and pain and dissapointments [sic] behind you. I know it won't be easy, but in time the old hurts will fade and they will be replaced with new feelings of happiness you've always wanted and believed you could never have. This new beginning for you will give you the ability to be happy.... *Together* we will deal with your depressions—including teaching the kids about what happens to you. *Together* we will show the kids what a healthy relationship can be like. *Together* we will finally find the happiness both of us have wanted so long.

These statements indicate that although formal counseling sessions had ceased, *Hess still saw himself in the role of therapist for both Cindy and her children.* Courts unanimously agree that a therapist's romantic and sexual involvement with a patient is a "harmful act." *See, e.g., Simmons v. United States,* 805 F.2d 1363 (9th Cir.1986) and cases cited therein.

The courts of other jurisdictions have applied statutes regarding social worker privilege. The Massachusetts Supreme Court found statements made to a social worker by a defendant regarding incestuous acts not privileged as communications revealing a crime or harmful act. *Massachusetts v. Berrio,* 407 Mass. 37, 551 N.E.2d 496, 499 (Mass. 1990). *See Massachusetts v. Collett,* 439 N.E.2d 1223, 1228, 387 Mass. 424 (Mass.1982) (holding that statements by a boyfriend to a social worker that he hit an abused mother as well as her child were not privileged). A New York court has applied the "crime or harmful act" exception to hold that statements made to a social worker indicating possible fraud were not privileged. *New York v. O'Gorman,* 91 Misc.2d 539, 398 N.Y.S.2d 336, 338 (N.Y.Sup.Ct.1977). *See Perry v. Fiumano,* 61 A.D.2d 512, 403 N.Y.S.2d 382, 386 (N.Y.Sup.Ct.1978) (holding that statements made to a social worker that may have bearing on a child's health, safety and welfare are not privileged, and are subject to compulsory disclosure under the "harmful acts" exception to social worker privilege).

Following a review of the applicable law, and under the facts and circumstances of this case, I cannot find that the trial court abused its discretion in ordering that social worker Terry be deposed in this matter. This court could exclude from the scope of the deposition any examination regarding Hess' relations with patients other than Cindy. As noted in the trial court's order, Terry's deposition would be reviewed to determine what parts, if any, are admissible evidence. This procedure is in accordance with a case from Montana. *State ex rel. Mapes v. District Court,* 250 Mont. 524, 822 P.2d 91, 95 (1991). In its writing, the Montana Supreme Court crafted an order allowing a party to depose a psychologist; the trial court would then make a determination of what parts, if any of the deposition testimony would be admissible evidence. The trial court could then enter a protective order sealing the psychologist's records from unnecessary public disclosure. *Id.* The trial court could take similar precautions in this matter.